# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

---

|  |  |  |
|---|---|---|
| BETHANY R. SCAER and STEPHEN SCAER, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No. |
| v. | : | |
| | : | |
| CITY OF NASHUA, a municipal corporation; JAMES W. DONCHESS, Mayor, City of Nashua, in his official and individual capacities; JENNIFER L. DESHAIES, Risk Manager, City of Nashua, in her official and individual capacities, | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... ii

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 3

ARGUMENT ............................................................................................................. 8

   I.    PLAINTIFFS WILL SUCCEED ON THE MERITS ....................................................... 8

      A.   The flags displayed on the Citizen Flag Pole are private speech .............. 8

      B.   The First Amendment forbids Defendants from discriminating
          against private speech on the basis of viewpoint ................................... 15

      C.   Nashua's flag application practice is an unconstitutional
          prior restraint ......................................................................................... 17

      D.   Nashua's flag policy is unduly vague and gives excessive
          enforcement discretion to officials ........................................................ 19

      E.   Nashua's flag policy is overbroad ......................................................... 20

   II.   DEFENDANTS IRREPARABLY DAMAGE PLAINTIFFS BY EXCLUDING
       THEIR POLITICAL SPEECH FROM THE CITIZEN FLAG POLE .............................. 22

   III.  PROTECTING FIRST AMENDMENT RIGHTS IS ALWAYS IN THE PUBLIC
       INTEREST, SO THE BALANCE OF EQUITIES FAVORS PLAINTIFFS ...................... 22

   IV.  THIS COURT SHOULD WAIVE THE RULE 65(c) SECURITY REQUIREMENT .......... 23

CONCLUSION ........................................................................................................ 24

TABLE OF AUTHORITIES

CASES

*Bl(a)ck Tea Soc'y v. City of Bos.,*
378 F.3d 8 (1st Cir. 2004) ........................................................ 22

*Carroll v. Craddock,*
494 F. Supp. 3d 158 (D.R.I. 2020) ................................. 10, 13, 14

*Comcast of Me./New Hampshire, Inc. v. Mills,*
435 F. Supp. 3d 228 (D. Me. 2019) .................................... 8, 15

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
473 U.S. 788 (1985) ................................................................... 15

*Cutting v. City of Portland,*
No. 2:13-cv-359-GZS, 2014 U.S. Dist. LEXIS 17481
(D. Me. Feb. 12, 2014) ............................................................. 22

*Doe v. Mills,*
16 F.4th 20 (1st Cir. 2021) ....................................................... 22

*Freedom from Religion Found. v. Hanover Sch. Dist.,*
626 F.3d 1 (1st Cir. 2010) ........................................................ 12

*Grayned v. City of Rockford,*
408 U.S. 104 (1972) ................................................................... 19

*Hart v. Thomas,*
422 F. Supp. 3d 1227 (E.D. Ky. 2019) .............................. 10, 14

*Hill v. Colorado,*
530 U.S. 703 (2000) ................................................................... 19

*Hopper v. City of Pasco,*
241 F.3d 1067 (9th Cir. 2001) ............................................ 19, 21

*Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines,*
925 F.2d 6 (1st Cir. 1991) ........................................................ 23

*Kotler v. Webb,*
No. CV 19-2682-GW-SKx, 2019 U.S. Dist. LEXIS 161118
(C.D. Cal. Aug. 29, 2019) ........................................................ 10

iii

*Matal v. Tam*,
 582 U.S. 218 (2017) ...................................................................... 9, 10, 11

*McBreairty v. Sch. Bd. of RSU22*,
 616 F. Supp. 3d 79 (D. Me. 2022) .................................................. 9, 15, 16

*Minn. Voters All. v. Mansky*,
 585 U.S. 1 (2018) ............................................................................... 19, 21

*NAACP v. Alabama*,
 377 U.S. 288 (1964) .................................................................................. 20

*New Eng. Reg'l Council of Carpenters v. Kinton*,
 284 F.3d 9 (1st Cir. 2002) ......................................................................... 17

*New Hope Family Servs. v. Poole*,
 966 F.3d 145 (2d Cir. 2020) ........................................................................ 9

*New York Times Co. v. Sullivan*,
 376 U.S. 254 (1964) .................................................................................. 17

*Norris v. Cape Elizabeth Sch. Dist.*,
 969 F.3d 12 (1st Cir. 2020) ......................................................................... 8

*Overington v. Fisher*,
 Civil Action No. 21-1133-GBW, 2024 U.S. Dist. LEXIS 86614
 (D. Del. May 14, 2024) ............................................................................. 14

*Pleasant Grove City v. Summum*,
 555 U.S. 460 (2009) .............................................................................. 9, 12

*Police Dep't of Chicago v. Mosley*,
 408 U.S. 92 (1972) .................................................................................... 15

*Reddy v. Foster*,
 No. 14-cv-299-JL, 2016 U.S. Dist. LEXIS 44965
 (D.N.H. Apr. 1, 2016) ............................................................................... 17

*Ridley v. Mass. Bay Transp. Auth.*,
 390 F.3d 65 (1st Cir. 2004) .................................................................. 15, 16

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
 515 U.S. 819 (1995) .................................................................................. 15

iv

*Shurtleff v. City of Boston,*
  596 U.S. 243 (2022) ................................................................................ 4, 9, 10, 12

*Shurtleff v. City of Boston,*
  928 F.3d 166 (1st Cir. 2019) ............................................................................. 6

*Shuttlesworth v. Birmingham,*
  394 U.S. 147 (1969) ....................................................................................... 18

*Sindi v. El-Moslimany,*
  896 F.3d 1 (1st Cir. 2018) ............................................................................. 17

*Sindicato Puertorriqueño de Trabajadores v. Fortuño,*
  699 F.3d 1 (1st Cir. 2012) ........................................................................ 8, 22

*Virginia v. Hicks,*
  539 U.S. 113 (2003) ....................................................................................... 20

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.,*
  576 U. S. 200 (2015) ....................................................................... 9, 10, 13, 14

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ....................................................................................... 17

*Westernbank P.R. v. Kachkar,*
  No. 07-1606 (ADC/BJM), 2008 U.S. Dist. LEXIS 109809
  (D.P.R. July 23, 2008) ................................................................................... 23

*Westfield High Sch. L.I.F.E. Club v. City of Westfield,*
  249 F. Supp. 2d 98 (D. Mass. 2003) ............................................................ 23

v

**INTRODUCTION**

The City of Nashua believes that it may allow only people whose viewpoints city officials favor to fly flags on the "Citizen Flag Pole" in front of city hall, while prohibiting flags with viewpoints that officials dislike. The city thus discriminates against minority and dissenting views—exactly those views that need First Amendment protection. According to Nashua, the dozens of flags expressing diverse and conflicting messages that people have flown on this pole over the past eight years have all been government speech. But Nashua cannot manipulate government speech doctrine into a ruse for favoring certain private speakers over others on the basis of viewpoint. The history of the Citizen Flag Pole, the public's perception of this pole, and Nashua's lack of control or shaping of the messages conveyed by the flags all show that the Citizen Flag Pole is a forum for private citizen speech—not an outlet for the government's own voice.

Nashua reserves the Citizen Flag Pole for local groups to fly flags expressing messages important to those groups—to support their cultural heritage, observe an anniversary, honor an accomplishment, or advocate a cause. Since 2019, the pole has flown flags celebrating causes as heterogenous as Brazilian Independence Day, Kurdistan, Francophonie, Christianity, Lutheranism, Pride Month, the Libertarian Party, the Lions Club, and women's suffrage.

Having established the Citizen Flag Pole as a forum for private speech, Defendants cannot now grant access to this forum to people whose viewpoints they find acceptable but deny it to those expressing disfavored views. Nashua, however,

1

does this explicitly. Its policy only permits flags whose speech Nashua "wishes to express and endorse"—speech that is "in harmony with city policies and messages" and in "the City's best interest." The policy explicitly forbids speech that is controversial or offensive to a vocal group in Nashua.

The city approves the vast majority of citizen flag applications. But it has repeatedly rejected flags proposed by Plaintiffs Bethany and Stephen Scaer—critics of Nashua's political leaders. Recently, for instance, Defendants would not allow Beth Scaer to raise the Pine Tree Flag, a traditional patriotic flag rooted in New Hampshire history that she wished to fly to commemorate the 249th anniversary of the Battle of Bunker Hill. According to Nashua's Mayor and its Risk Manager, the city objects to the Pine Tree Flag's message—although they never explained why.

Moreover, Nashua's flag policy does not just codify viewpoint discrimination. It is also unconstitutionally vague, overbroad, and an arbitrary prior restraint. Until May 2022, Nashua had no written flag policy at all. And its current written policy lacks any objective criteria for evaluating flag applications—it gives boundless subjective discretion to officials to chill the speech of their political and ideological opponents.

Nashua cannot turn its flag-application process into a cover for censorship. Plaintiffs Beth and Stephen Scaer, and the public at large, are entitled to preliminary injunctive relief protecting their freedom of speech.

2

**STATEMENT OF FACTS**

Nashua permits people to apply to display a flag of their own choosing on a specific pole in front of city hall. Beth[1] Decl., ¶¶ 4-7; Stephen Decl., ¶¶ 5-6. Defendants referred to this pole as the Citizen Flag Pole for years, including as recently as December 2023. *See* Ex. A; Beth Decl., ¶¶ 5-6. The Citizen Flag Pole is reserved for "persons to fly a flag in support of cultural heritage, observe an anniversary, honor a special accomplishment, or support a worthy cause." Ex. B at 2; Ex. D. Until May 2022, Nashua had no written policy limiting what could be displayed on the Citizen Flag Pole. Beth Decl., ¶ 13. Those wishing to use the pole had to submit a Special Events Application, provide the physical flag, pledge to abide by local ordinances, and indemnify the city in the event of damage. *Id.*, ¶¶ 7-8; Ex. C. According to Nashua's records, the city never refused to fly any flag prior to October 2020. *See* Beth Decl., ¶¶ 21-22, 32.

Flags on the Citizen Flag Pole are usually displayed for a week. *Id.*, ¶ 9. Short ceremonies at the City Hall Plaza often accompany flag raisings. *Id.*, ¶¶ 7, 10; Stephen Decl., ¶¶ 6-8. Local politicians sometimes attend flag-raising ceremonies, speak at them, or use them as an opportunity to interact with constituents. Beth Decl., ¶¶ 7, 10; Stephen Decl., ¶¶ 6-8. Some flags, however, are raised without any ceremony, by the applicants themselves, without spectators or fanfare. *See* Beth Decl., ¶¶ 7, 10, 21, 28; Stephen Decl., ¶¶ 7, 12, 14. Examples of flags flown since

---

[1] Because Plaintiffs have the same surname, this brief will refer to them as "Beth" and "Stephen" for the sake of clarity.

Nashua's flag program began in 2017 include flags celebrating Indian Independence Day, Brazilian Independence Day, Kurdistan, Francophonie, Christianity, Lutheranism, Pride Month, the Libertarian Party, the Lions Club, organ donation, and women's suffrage. Beth Decl., ¶¶ 11-12, 32; Stephen Decl., ¶¶ 6, 8-9.

On May 11, 2022—just over a week after the Supreme Court's unanimous decision in *Shurtleff v. City of Boston*, 596 U.S. 243 (2022)—the City of Nashua issued a written flag policy. Ex. D; Beth Decl., ¶¶ 15-16. The new policy, Ex. D, states:

> A flag pole in front of City Hall may be provided for use by persons to fly a flag in support of cultural heritage, observe an anniversary, honor a special accomplishment, or support a worthy cause. Any group wishing to fly a flag must provide the flag. This potential use of a City flag pole is not intended to serve as a forum for free expression by the public. Any message sought to be permitted will be allowed only if it is in harmony with city policies and messages that the city wishes to express and endorse. This policy recognizes that a flag flown in front of City Hall will be deemed by many as City support for the sentiment thereby expressed, city administration reserves the right to deny permission or remove any flag it considers contrary to the City's best interest.

Around the same time, Nashua also revised its Special Events Procedure to include a section describing flag applications. Ex. E; Beth Decl., ¶¶ 17-18. The revised Procedures, Ex. E., states:

> Requests to fly a flag shall be made to the Risk Manager or designee and will be evaluated in accordance with the City's flag pole policy. Applications shall include a photograph of the flag proposed and an explanation of the message intended to be conveyed. No single organization or agency shall monopolize the City flag pole.
>
> A. The Special Event Application (SEACH2022) should be completed in its entirety and shall be subject to review and approval of the Risk

4

Manager. The Risk Manager reserves the right to decline any non-compliant application for use of the City flag pole for a given day or time period. The Applicant is to be notified as soon as a decision has been made.

Nashua's Risk Manager and others in the mayor's office decide which flags to approve or reject, without consulting or involving the Board of Aldermen. *See* Ex. H; Ex. I; Beth Decl., ¶¶ 35, 37-40. Rejected applicants may appeal to the mayor. Ex. H.

Nashua resident Bethany Scaer first applied to display a flag on the Citizen Flag Pole in October 2017, when she was permitted to raise the Luther Rose Flag in honor of the 500th anniversary of the Protestant Reformation. *See* Beth Decl., ¶ 19; Stephen Decl., ¶ 10. Beth provided a flag she owned, raised it on the pole herself, and organized a small ceremony herself, which was attended by approximately six people, none of whom represented the city. Beth Decl., ¶ 19; Stephen Decl., ¶ 10. Beth has also been permitted to fly her Lutheran Flag again in April 2021, a flag honoring the ratification of the Nineteenth Amendment in August 2021, and the Christian Flag in April 2024. Beth Decl., ¶¶ 20, 28-29; Stephen Decl., ¶¶ 11, 14-15. Small ceremonies—attended by less than a dozen people—accompanied all these flag raisings, but no city representatives attended any of them. Beth Decl., ¶¶ 20, 28-29; Stephen Decl., ¶¶ 11, 14-15

In 2020, Beth received permission to raise a Save Women's Sports flag, which expresses her viewpoint that allowing biological males to compete against women in sports denies women their rights and the equality due them under the Constitution and Title IX. Beth Decl., ¶¶ 21, 45; Stephen Decl., ¶ 12. Beth planned to fly the flag

from October 10 to October 16 and hold a fundraiser at the end of that week. Beth Decl., ¶ 21. A day into that week, Nashua revoked its permission and took the flag down, after people complained that the flag was "transphobic." Ex. F; Beth Decl., ¶¶ 22, 24-25. Scaer appealed to Mayor Donchess, but the city refused to allow the flag and cited *Shurtleff v. City of Boston*, 928 F.3d 166 (1st Cir. 2019) in justification. Ex. G; Beth Decl., ¶¶ 23, 26-27. After the Supreme Court overturned this decision, Beth and a friend both applied to fly different versions of the Save Women's Sports flag, but Defendants again refused. *See id.*, ¶¶ 30-32.

On February 7, 2024, Stephen Scaer applied to raise the Detransitioner Awareness Flag, in remembrance of Detrans Awareness Day on March 12. Ex. J; Stephen Decl., ¶¶ 16, 20. The Detransitioner Awareness Flag celebrates the bravery that gender detransitioners show by enduring threats, ridicule, discrimination, and often painful and expensive medical care in order to live according to their biological sex. *Id.*, ¶¶ 17-18, 23. On February 14, Defendant Deshaies denied Stephen's application because the Detransitioner Awareness Flag supposedly "is not in harmony with the message that the City wishes to express and endorse," and Defendant Donchess upheld this decision on appeal. Ex. J; Stephen Decl., ¶ 19.

On May 27, 2024, Beth applied to fly the Pine Tree Flag to commemorate the Nashua soldiers who fought and died at the Battle of Bunker Hill (fought June 17, 1775). Ex. H; Beth Decl., ¶¶ 34-35. The Pine Tree Flag is a traditional American emblem, carried by New England troops during the early years of the American Revolution, and still flown all over New Hampshire due to the flag's importance in

6

the state's history. Ex. H; Ex. I at 1; Beth Decl., ¶¶ 36, 38-40. Beth wanted to display the flag in celebration of the values and political ideas of the American Revolution, such as limited government, divinely endowed rights, and the right of the people to rebel against tyrannical government. *See id.*, ¶¶ 36, 43. Defendant Deshaies denied Beth's application, stating that the Pine Tree Flag "is not in harmony with the message that the City wishes to express and endorse." Ex. H at 3. Defendant Donchess upheld this decision on appeal. *Id.* at 1. Neither Defendant explained what was supposedly objectionable about the Pine Tree Flag. *See id.*

Plaintiffs intend to and would fly a variety of flags expressing their political viewpoints on the Citizen Flag Pole, if Defendants allowed it. Beth Decl., ¶¶ 2-3, 42-47; Stephen Decl., ¶¶ 2-3, 22-26. If given permission, for instance, Beth and Stephen Scaer would fly the Pine Tree Flag on June 17, 2025 (the 250th anniversary of Bunker Hill), the Save Women's Sports Flag for the anniversary of Title IX next year, the Detransitioner Awareness Flag for Detrans Awareness Day in March, and the Pro-Life Flag for the anniversary of the Supreme Court's *Dobbs* decision. Beth Decl., ¶¶ 43, 45-46; Stephen Decl., ¶¶ 23, 25. Beth and Stephen find it frustrating and degrading to have their flag requests denied by the city, while other residents— whose views find favor with a majority of Nashua residents, or at least are not offensive to them—are allowed to promote their viewpoints through flags. Beth Decl., ¶¶ 48-49; Stephen Decl., ¶¶ 27-28. Unless and until they receive judicial relief, the Scaers expect to make fewer or different flag applications, to avoid repeated rejections. Beth Decl., ¶¶ 47, 50; Stephen Decl., ¶¶ 26, 29.

### ARGUMENT

When assessing a motion for preliminary injunction, a court must consider: (1) the likelihood of success on the merits; (2) the likelihood of irreparable harm; (3) whether the balance of equities favors the injunction; and (4) whether the injunction is in the public interest. *Norris v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 22 (1st Cir. 2020). "In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012). Once Plaintiffs "show that the state law infringes on their First Amendment rights," the burden shifts to the government to "justify its restriction on speech under the appropriate constitutional standard." *Comcast of Me./New Hampshire, Inc. v. Mills*, 435 F. Supp. 3d 228, 233 (D. Me. 2019) (citations and internal quotation marks omitted). Defendants cannot meet their burden of justifying their viewpoint-based prohibition of flags that city officials subjectively deem to conflict with what the "city wishes to express and endorse[,]" not in "the City's best interest[,]" or not a "worthy cause."

I.    PLAINTIFFS WILL SUCCEED ON THE MERITS

    A.  The flags displayed on the Citizen Flag Pole are private speech

Nashua's Citizen Flag Pole constitutes a forum for private speech by the general public, rather than an outlet for government speech. Defendants, however, assert that the flag pole is "not intended to serve as a forum for free expression by the public," because Nashua reviews applications and allegedly only approves flags that are "in harmony with city policies and messages that the city wishes to express and

endorse." Ex. D; *see also* Ex. H at 3. The actual facts of this case belie Defendants'

self-serving claim. The Citizen Flag Pole is a limited public forum, which the city

must regulate in a reasonable and viewpoint neutral way. *See McBrearty v. Sch.*

*Bd. of RSU22*, 616 F. Supp. 3d 79, 93 (D. Me. 2022). And the city's policy is no more

than a veneer to allow it to favor some citizens' views over others'.

"[T]he mere fact that government authorizes, approves, or licenses certain

conduct does *not* transform the speech engaged therein into government speech."

*New Hope Family Servs. v. Poole*, 966 F.3d 145, 171 (2d Cir. 2020) (emphasis

original) (collecting cases). "If private speech could be passed off as government

speech by simply affixing a government seal of approval, government could silence

or muffle the expression of disfavored viewpoints." *Matal v. Tam*, 582 U.S. 218, 235

(2017). Thus, the Supreme Court had warned of a "legitimate concern" that

governments might abuse "government speech doctrine . . . as a subterfuge for

favoring certain private speakers over others based on viewpoint." *Pleasant Grove*

*City v. Summum*, 555 U.S. 460, 473 (2009). Because government-speech doctrine "is

susceptible to dangerous misuse, courts "must exercise great caution before

extending [] government-speech precedents." *Tam*, 582 U.S. at 235; *see also*

*Shurtleff*, 596 U.S. at 263 (Alito, J., concurring) (courts must "prevent the

government-speech doctrine from being used as a cover for censorship").

Courts assess whether a government is speaking or merely regulating private

speech through "a holistic inquiry" scrutinizing three main factors: "the history of

the expression at issue; the public's likely perception as to who (the government or a

private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Shurtleff*, 596 U.S. at 252. The facts of one case, *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U. S. 200 (2015), "likely mark[] the outer bounds of the government-speech doctrine." *Tam*, 582 U. S. at 239. If the factors weighing in favor of government speech are not at least as strong as in *Walker*, a court must find the speech private. *See, e.g.*, *Carroll v. Craddock*, 494 F. Supp. 3d 158, 166 (D.R.I. 2020); *Hart v. Thomas*, 422 F. Supp. 3d 1227, 1233 (E.D. Ky. 2019); *Kotler v. Webb*, No. CV 19-2682-GW-SKx, 2019 U.S. Dist. LEXIS 161118, at *17, *24 (C.D. Cal. Aug. 29, 2019).

Here, all three factors demonstrate that the flags displayed on the Citizen Flag Pole are private speech. First, historically, the Citizen Flag Pole was a forum for citizen speech—as the pole's name (used by Defendants at least as recently as December 2023) shows. *See* Beth Decl., ¶ 5. Far from mentioning government speech, Nashua's website formerly noted that the "Citizen Flag Pole" is "reserved for the citizens of Nashua to fly a flag." Ex. A. Nashua's records reveal that, until October 2020, the city never rejected a proposed flag and that, until May 2022, the city had no written flag policy. *See* Ex. B; Beth Decl., ¶¶ 13-15, 32. Even the Save Women's Sports Flag was originally approved and flew for a day, until the heckler's veto prevailed. *Id.*, ¶¶ 21-24, 49; *see also* Ex. F. After Nashua removed Beth's flag, it justified its action by citing a now-overruled precedent that misconstrued government-speech doctrine. *See* Ex. G; *Shurtleff*, 596 U.S. at 251, 259.

Although Defendants insist that the pole is not "a forum for free expression by the public," Ex. D, Nashua's Event Procedures state that "[n]o single organization or agency shall monopolize the City flag pole," Ex. E at 2. If the flags on the pole were exclusively government speech, then by definition a single organization—the Nashua city government—monopolizes the flag pole. As a result, this provision of the City's policy shows that the pole is a forum for non-city organizations and agencies. The policy only has to prohibit monopolizing because flags are the speech of the applicants. Such a provision would not be necessary if flags were the city's own speech.

Second, inhabitants of Nashua likely perceive the flags on the Citizen Flag Pole as private speech—as the pole's name implies. Since 2017, the pole has displayed flags with a range of perspectives, including some that would be strange or inappropriate for a city to express. *See* Beth Decl., ¶¶ 11-12; Stephen Decl., ¶¶ 8-9. And often, these flags were raised by private citizens, who conducted a flag-raising ceremony involving controversial speeches, without anyone from the city present. Beth Decl., ¶¶ 10, 19-20, 28-29; Stephen Decl., ¶¶ 10-12, 14-16. If the flags on the Citizen Flag Pole are government speech, then Nashua "is babbling prodigiously and incoherently" and "expressing contradictory views." *Tam*, 582 U.S. at 236.

A viewer is unlikely to think, for instance, that Nashua has an official position about whether Kurdistan should be independent from Iraq; whether the Free State Project and the growth of the Libertarian Party benefits New Hampshire; or whether the Protestant Reformation marked the birth of religious freedom. *See*

11

Beth Decl., ¶ 11-12, 19-20, 32; Stephen Decl., ¶¶ 10-12, 14-16. People living in Nashua have opinions about these issues—not the city itself.

Indeed, it is doubtful that Nashua even could "express and endorse," Ex. D, the message of the Christian Flag or the Luther Rose Flag in its own voice, without violating the Constitution. "The Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise" through "subtle coercive pressure that interferes with an individual's real choice." *Freedom from Religion Found. v. Hanover Sch. Dist.*, 626 F.3d 1, 12 (1st Cir. 2010) (cleaned up). A city cannot use government speech and resources to subtly pressure citizens into supporting Protestant Christianity or Christianity in general. *See Summum*, 555 U.S. at 468 ("government speech must comport with the Establishment Clause."). As a result, an objective viewer likely would perceive that the Christian and Luther Rose flags, for instance, express the viewpoints of those who applied and who gathered at the ceremony to raise them—not of the city itself. "[A] pedestrian . . . might simply look down onto the plaza, see a group of private citizens conducting a ceremony without the city's presence, and associate the new flag with them, not [Nashua]." *Shurtleff,* 596 U.S. at 255.

Finally, far from shaping the message, Nashua requires that flag applications include "a photograph of the flag and an explanation of the message intended to be conveyed." Ex. E at 2. That is, the message of the flag and its exact iconography must be fixed before Nashua even reviews the application. Anyone "wishing to fly a flag must provide the flag," Ex. D, which remains the applicant's property, and

12

which the applicant may take home once its time on the pole is complete, *see* Beth Decl., ¶ 8; Stephen Decl., ¶ 10. Simply put, the city has no role whatsoever in crafting the flag or its message.

The city also does not shape or control flag-raising ceremonies, although these ceremonies convey a flag's meaning to the public. Nashua merely requires applicants to describe a ceremony's basic details (such as the number of attendees and the extent to which the ceremony may occupy the sidewalk). Beth Decl., ¶ 10. Once a flag is approved, applicants often raise the flag themselves, without anyone from the city present. *Id.*, ¶¶ 10, 19-20, 28-29.

Applicants have used flag-raising ceremonies as an opportunity to attack city policies. When Beth Scaer raised a flag honoring the Nineteenth Amendment, for instance, she delivered a speech, discussing how Mayor Donchess' gender-identity policies undermined women's sex-based rights. *Id.*, ¶ 28. Likewise, when the Christian Flag was raised in March 2024, ceremony speakers urged the audience to reclaim America for Jesus Christ and criticized Nashua for allowing flags such as the Pride Flag that support progressive politics while rejecting flags with conservative messages. *Id.*, ¶ 29. Nashua most certainly did not speak these messages, criticizing itself.

Indeed, the city probably could not speak the Christian Flag's message without violating the Establishment Clause. Nashua did nothing to shape or control these flags' messages, beyond approving or rejecting the applications in the first place. *Cf.*

13

*Carroll*, 494 F. Supp. 3d at 165 ("trademarks are not government speech, even though the government exclusively controls the process for issuing trademarks.")

This case contrasts greatly with the "outer bounds" set in *Walker*: a case about vehicle license plates that were not vanity plates. In *Walker*, the state government owned the plates and the designs on them, had exclusive choice over these designs, used images and slogans on the plates to promote tourism and local industries, required unused plates be returned to the state, and treated them as "essentially, government IDs." 576 U. S. at 211-13.

The flags displayed on the Citizen Flag Pole are more similar to vanity license plates, which courts have repeatedly held constitute private speech. *See, e.g.*, *Overington v. Fisher*, Civil Action No. 21-1133-GBW, 2024 U.S. Dist. LEXIS 86614, at *9 (D. Del. May 14, 2024) (collecting cases); *Carroll*, 494 F. Supp. 3d at 165-66; *Hart*, 422 F. Supp. 3d at 1233. The Supreme Court explicitly stated its *Walker* holding did not apply to vanity plates. 576 U. S. at 204; *see also Carroll*, 494 F. Supp. 3d at 166. Like vanity plates, flag applicants design the message, present finished designs to the government for approval or rejection only, and sometimes speak messages that are politically controversial or inappropriate for a local government. Flag applicants own the flags, provide them to the state for short periods, and can take possession of them again afterwards. Beth Decl., ¶¶ 7-8; Stephen Decl., ¶ 10. The facts of this case, thus, demonstrate that the flags on the Citizen Flag Pole are private speech.

14

B.  The First Amendment forbids Defendants' viewpoint discrimination

The city cannot discriminate against private speech in any forum on the basis of viewpoint. "The bedrock principle of viewpoint neutrality demands that the state not suppress speech where the real rationale for the restriction is disagreement with the underlying ideology or perspective that the speech expresses." *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 82 (1st Cir. 2004). "[G]overnment may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). "In the context of a First Amendment claim," once a plaintiff states a prima facie case, the government bears the burden to "justify its restriction on speech under the appropriate constitutional standard." *Comcast*, 435 F. Supp. 3d at 233 (cleaned up).

The Citizen Flag Pole constitutes a limited public forum, because Nashua intentionally opened the pole in 2017 and "reserve[d] it for certain groups or for the discussion of certain topics." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *see also* Ex. B (limiting the pole to flags "in support of a cultural heritage, observe an anniversary, honor a special accomplishment, or support a worthy cause"). "[I]n a limited public forum, government '[c]ontrol over access to [the] forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.'" *McBreairty*, 616 F. Supp. 3d at 93 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)).

15

However, if the Citizen Flag Pole were a non-public forum, the analysis would not change. Indeed, "a limited public forum . . . is the equivalent of a non-public forum." *Ridley*, 390 F.3d at 76 & n.4. Access to a non-public forum can only be restricted "as long as the restrictions are reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* at 97 (cleaned up); *see also McBreairty*, 616 F. Supp. 3d at 91 (similar). "Regardless of how the [] forum should be classified," *Ridley*, 390 F.3d at 97, governments can never discriminate based on viewpoint or impose unreasonable distinctions.

Defendants' flag policy facially discriminates against flag applicants on the basis of viewpoint. Nashua will only allow a flag to fly if its "message sought . . . is in harmony with city policies and messages that the city wishes to express and endorse" and if "the sentiment thereby expressed" is not "contrary to the City's best interest." Ex. D; *see also* Ex. E. (requiring flag applications include "an explanation of the message intended"). Defendants admit that they denied the Pine Tree Flag and the Detransitioner Awareness Flag because they objected to the message that Beth and Stephen Scaer expressed. Ex. H; Ex. J.

Plaintiffs' message—that is, their viewpoint—is exactly what Defendants sought to keep off the pole. Nashua opened the Citizen Flag Pole to the topic of gender identity, by permitting the display, for instance, of the Pride Flag. Beth Decl., ¶¶ 11, 28-29, 49. It is unreasonable for Defendants to insist that one set of cultural views, heritages, anniversaries, or causes can be celebrated on the pole, while another set cannot. *See* Beth Decl., ¶¶ 11, 22-24, 29, 47-49. Even the word "worthy"

16

in Nashua's policy, Ex. D (permitting flags that "support a worthy cause"), authorizes city officials to reject certain flag applications based on officials' subjective opinions about what political goals are worthy or unworthy. In a country with "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), those are precisely the judgments that the First Amendment leaves to citizens—not to government censors.

C.  Nashua's flag application practice is an unconstitutional prior restraint

Defendants impose an arbitrary prior restraint by stopping anyone from using the Citizen Flag Pole without first obtaining the city's endorsement of their viewpoint. Prior restraints are "the most serious and the least tolerable infringement on First Amendment rights," *Sindi v. El-Moslimany*, 896 F.3d 1, 31 (1st Cir. 2018) (citation omitted), for they give "public officials the power to deny use of a forum in advance of actual expression," *Reddy v. Foster*, No. 14-cv-299-JL, 2016 U.S. Dist. LEXIS 44965, at *32-33 (D.N.H. Apr. 1, 2016) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 795 n.5 (1989)). "There is a strong presumption that prior restraints on speech are unconstitutional." *Sindi*, 896 F.3d at 31.

To be valid, the First Amendment demands that prior restraints contain "narrow, objective, and definite standards to guide the licensing authority." *New Eng. Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 21 (1st Cir. 2002) (citation omitted). Moreover, there must be three procedural safeguards as well: "that prior restraints may be imposed only temporarily; that they must allow for prompt

17

judicial review; and that the licensor must bear the burden of asking a court to suppress the speech." *Id.*

Far from containing definite standards, Defendants here denied Plaintiffs' flag applications under a policy that lacks any objective criteria. *See* Beth Decl., ¶¶ 34-37, 48. Nashua's flag policy empowers "city administration . . . to deny permission or remove any flag it considers contrary to the City's best interest." Ex. D. Only flags with messages "in harmony with city policies and messages that the city wishes to express and endorse" are permitted. *Id.* But the policy never explains what messages the city wishes to express or endorse or how city officials will evaluate Nashua's interests. Officials in the mayor's office possess the "unbridled and absolute power," *Shuttlesworth v. Birmingham*, 394 U.S. 147, 150 (1969), to prohibit flags based on their own subjective assessments. These executive officials do not consult with the Board of Aldermen, *see* Ex. I, and the only avenue of appeal is to the mayor—not to the judiciary.

Indeed, city officials do not even provide reasoning. *See* Ex. I. Defendants denied Beth and Stephen Scaers' applications without any explanation. *See* Beth Decl., ¶¶ 34-37, 48; Stephen Decl., ¶¶ 19, 27. Supposedly, the Pine Tree Flag and the Detransitioner Awareness Flags are "not in harmony with the message the City wishes to express or endorse"—a conclusory statement that quotes the flag policy. Ex. H; Ex. J. But Plaintiffs have no idea why honoring American soldiers or recognizing the existence of a minority group are inharmonious. Nashua's flag

policy is an unconstitutional prior restraint, subjecting Plaintiffs' rights to the arbitrary subjective decisions of unaccountable city officials.

D. Nashua's flag policy is unduly vague and gives excessive enforcement discretion to officials

Defendants' criterion-free flag policy is also unconstitutionally vague. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law can be "impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citation omitted).

"Where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. at 109 (cleaned up). "An indeterminate prohibition carries with it the opportunity for abuse, especially where it has received a virtually open-ended interpretation," so official discretion "must be guided by objective, workable standards," lest an official's "own politics may shape his views on what counts." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 21-22 (2018) (cleaned up). Even "in a nonpublic forum, the State must be able to articulate some sensible basis for distinguishing what may

19

come in from what must stay out." *Id.* at 16; *see also Hopper v. City of Pasco*, 241 F.3d 1067, 1077-78 (9th Cir. 2001) ("Absent objective standards, government officials may use their discretion to interpret the policy as a pretext for censorship").

Defendants' flag policy contains multiple terms—"in harmony with city policies," "messages that the city wishes to express and endorse," "contrary to the City's best interest," "worthy"—whose meaning is undefined, vague, and inherently subjective. Ex. D. Such language supplies no notice of what flags the city will accept. Nashua's decisions are so unpredictable that the city has accepted and rejected the exact same flag, on different applications. *See* Beth Decl., ¶¶ 21-22, 32.

The flag policy's vague language also encourages city officials to abuse their authority by denying applications from their political opponents, such as the Scaers—known critics of Mayor Donchess. *See* Beth Decl., ¶¶ 2-3, 28, 44, 48; Stephen Decl., ¶¶ 2-3, 14, 24, 27. Plaintiffs find it frustrating and degrading to have their applications denied without justification, so they expect to submit flag applications less often or differently in the future, to avoid more denials. Beth Decl., ¶¶ 47-48, 50; Stephen Decl., ¶¶ 26-27, 29. The very vagueness of Defendants' flag policy enables them to censor speech they dislike.

E.  Nashua's flag policy is overbroad

Speech regulations may not "sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP v. Alabama*, 377 U.S. 288, 307 (1964). "The showing that a law punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep, suffices to invalidate *all*

20

enforcement of that law, until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (internal quotation marks and citations omitted) (emphasis original).

Nashua could have instituted a narrow policy, prohibiting flags from flying on the Citizen Flag Pole if those flags communicate unprotected speech, such as fighting words, obscenity, or true threats. Instead, Defendants chose to ban any flag "contrary to the City's best interest." Ex. D. Because this broad category lacks "objective, workable standards," a city official's "own politics may shape his views on what counts." *Minn. Voters*, 585 U.S. at 21-22.

Defendants apparently interpret this broad provision to permit them to prevent symbolic speech that would offend large numbers of their Nashua constituents. *See* Beth Decl., ¶¶ 22-24, 48-49; Stephen Decl., ¶¶ 27-28. Local politicians use flag-raising ceremonies as an opportunity to build their network and curry favor with voters—so they are susceptible to the heckler's veto. *See* Beth Decl., ¶ 10; Stephen Decl., ¶¶ 7-8. Nashua allows flags expressing popular opinions to be displayed while flags that express dissenting viewpoints, on both the right and the left, are forbidden. Beth Decl., ¶ 48. In doing so, Nashua's practice unconstitutionally restricts so-called offensive speech and gives political majorities a heckler's veto over minority, dissenting views, such as the Scaer's. *See Hopper,* 241 F.2d at 1079-80 (city's ban on "controversial art" invited viewpoint discrimination). "Not only was [the city's] policy intrinsically flawed, its enforcement of the policy was, in practice,

21

contingent upon the subjective reaction of viewers of the [iconography], as perceived by the city management." *Id.*

Thus, Defendants' interpretation of their overbroad policy sweeps in vast amounts of protected expression, simply because that expression is unpopular. By implementing and enforcing these polices on the basis of their viewpoints, Defendants deprive Plaintiffs of their constitutional freedoms

II. DEFENDANTS IRREPARABLY DAMAGE PLAINTIFFS BY EXCLUDING THEIR POLITICAL SPEECH FROM THE CITIZEN FLAG POLE

"A burden on protected speech always causes some degree of irreparable harm." *Bl(a)ck Tea Soc'y v. City of Bos.*, 378 F.3d 8, 15 (1st Cir. 2004); *see also Sindicato*, 699 F.3d at 10-11. Injunctive relief is required to address the irreparable injury that Beth and Stephen Scaer presently suffer. The Scaers have testified about specific flags they would fly over the next year, if permitted, such as the Pine Tree Flag on the 250th anniversary of the Battle of Bunker Hill and the Save Women's Sports Flag on the anniversary of Title IX. Beth Decl., ¶¶ 43, 45-46; Stephen Decl., ¶¶ 22-26. Unless this Court grants relief, Defendants will continue to prohibit such flags and deny Plaintiffs access to the Citizen Flag Pole.

III. PROTECTING FIRST AMENDMENT RIGHTS IS ALWAYS IN THE PUBLIC INTEREST, SO THE BALANCE OF EQUITIES FAVORS PLAINTIFFS

"When the Government is the opposing party," courts "merge" "balancing of the equities and analysis of the public interest together." *Doe v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (cleaned up). Plaintiffs' "interest in avoiding interference with their rights to free speech outweighs the City's interest in enforcing an unconstitutional

[policy]" because "[p]rotecting rights to free speech is ipso facto in the interest of the general public." *Cutting v. City of Portland*, No. 2:13-cv-359-GZS, 2014 U.S. Dist. LEXIS 17481, at *35 (D. Me. Feb. 12, 2014) (citation omitted).

Denying injunctive relief would leave Defendants free to violate the rights of the Scaers and the public through their unconstitutional policy. In contrast, enjoining this policy would not stop Nashua from performing any legitimate city function. Until May 2022, Nashua had no written flag, and until October 2020, the city had never rejected a flag. Beth Decl., ¶¶ 13-16, 32. Nashua can return to the viewpoint-neutral practices that governed the Citizen Flag Pole prior to October 2020, without disruption. Defendants suffer no valid harm from a preliminary injunction.

IV.    THIS COURT SHOULD WAIVE THE RULE 65(C) SECURITY REQUIREMENT

District courts possess "substantial discretion to dictate the terms of an injunction bond." *Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines*, 925 F.2d 6, 9 (1st Cir. 1991) (collecting cases). "The bond amount may be zero if there is no evidence the party will suffer damages" for "the burden is on the party seeking security to establish a rational basis for the amount." *Westernbank P.R. v. Kachkar*, No. 07-1606 (ADC/BJM), 2008 U.S. Dist. LEXIS 109809, at *47 (D.P.R. July 23, 2008) (cleaned up). Furthermore, "the First Circuit has recognized an exception to the security bond requirement in Fed. R. Civ. P. 65(c) in suits to enforce important federal rights or public interests." *Westfield High Sch. L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98, 129 (D. Mass. 2003) (citation and internal quotation marks omitted). Prohibiting Defendants from denying Plaintiffs equal access to the

23

Citizen Flag Pole will not cause Defendants to suffer any harm, monetary or non-monetary. *See id.* at 128-29 (dispensing with bond so as not to deter exercise of First Amendment rights). Nashua requires flag applicants to provide the flag, obey ordinances, and indemnify the city. Beth Decl., ¶¶ 7-8; Ex. C. The city will incur no monetary costs from these flags and is not harmed by having to respect the First Amendment rights of citizens. This Court should impose no bond requirement.

CONCLUSION

This Court should grant Plaintiffs' motion for a preliminary injunction, enjoining Defendants from denying flag applications on the basis of viewpoint and as otherwise set forth in the proposed order.

Dated: September 5, 2024

Respectfully submitted,

*/s/ Roy S. McCandless*
Roy S. McCandless
New Hampshire Bar No. 11850
ROY S. MCCANDLESS, ESQ., PLLC
125 North State Street
Concord, New Hampshire 03301
Tel: (603) 841-3671, Ext. 101
Fax: (603) 513-2799
roysmccandless@gmail.com

/s/ *Nathan J. Ristuccia*
Nathan J. Ristuccia*‡
Virginia Bar No. 98372
Endel Kolde*
Washington Bar No. 25155
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW
Suite 801
Washington, D.C. 20036
Tel: (202) 301-3300
Fax: (202) 301-3399
nristuccia@ifs.org
dkolde@ifs.org

*Pro hac vice to be filed*

*Counsel for Plaintiff*

---

‡ Not a D.C. Bar Member but providing legal services in the District of Columbia exclusively before federal courts, as authorized by D.C. Ct. App. R. 49(c)(3).

## CERTIFICATE OF SERVICE

I hereby certify that, on September 5, 2024, Plaintiffs' counsel initiated process service on Defendants. That process is not yet complete. An updated certificate of service will be filed once complete.

Executed under penalty of perjury.

Dated: September 5, 2024

*s/Nathan J. Ristuccia*