**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 3-10-2025**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
BETHANY SCAER AND STEPHEN SCAER     *
                                    *   24-cv-277-LM-TSM
            v.                      *   November 5, 2024
                                    *   10:39 a.m.
CITY OF NASHUA, NEW HAMPSHIRE, ET   *
AL                                  *
                                    *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
BEFORE THE HONORABLE TALESHA SAINT-MARC

APPEARANCES:

For the Plaintiffs:     Nathan Ristuccia, Esq.
                        Endel Kolde, Esq.
                        Institute for Free Speech

                        Roy S. McCandless, Esq.
                        McCandless Law Firm


For the Defendants:     Jonathan A. Barnes, Esq.
                        Steven A. Bolton, Esq.
                        City of Nashua
                        Office of Corporation Counsel

                        Peter G. Callaghan, Esq.
                        Kat J. Mail, Esq.
                        Preti, Flaherty, Beliveau, Pachios, LLP

                        Adam B. Pignatelli, Esq.
                        Piper Fenoff, Esq.
                        Rath, Young & Pignatelli, PA


Court Reporter:         Susan M. Bateman, RPR, CRR
                        Official Court Reporter
                        United States District Court
                        55 Pleasant Street
                        Concord, NH 03301
                        (603) 225-1453

```
 1                    P R O C E E D I N G S

 2            THE CLERK:  This Court is now in session and has

 3    before it a hearing on a motion for preliminary injunction in

 4    the matter of Scaer, et al. versus City of Nashua, et al.,

 5    24-cv-277-LM.

 6            Would counsel please identify themselves for the

 7    record, starting with counsel for the plaintiff.

 8            MR. RISTUCCIA:  Nathan Ristuccia, your Honor.

 9            These are my clients, Bethany and Stephen Scaer.

10            THE COURT:  Good morning.

11            MR. KOLDE:  Del Kolde for the plaintiff also.

12            Mr. Ristuccia will be arguing today.

13            THE COURT:  All right.  Thank you.

14            MR. MCCANDLESS:  And Roy McCandless, local counsel.

15            THE COURT:  All right.

16            MR. BARNES:  Good morning.

17            Jonathan Barnes, assistant corporation counsel for

18    the City of Nashua.

19            With me is Steve Bolton.  He's corporation counsel.

20            THE COURT:  Good morning.

21            MR. BOLTON:  Good morning.

22            MR. PIGNATELLI:  Good morning, your Honor.

23            Adam Pignatelli for Mayor Donchess.

24            And with me is my colleague, Piper Fenoff.

25            THE COURT:  Good morning.
```

```
 1              MR. CALLAGHAN:  And Peter Callaghan for Jennifer
 2   Deshaies.
 3              And Kat Mail is with me as well for Ms. Deshaies.
 4              THE COURT:  All right.  Good morning, everybody.
 5              I'll turn that on so you can hear me a little bit
 6   better.
 7              All right.  So we're here on the preliminary
 8   injunction motion.
 9              I'll start off by hearing from the plaintiffs, and I
10   would like to start out with the mootness argument before you
11   get into any argument on the merits.
12              And because we have a court reporter, I'll just
13   remind everybody to just speak slowly.
14              And, Susan, remind me if I start speaking too fast
15   to do the same, please.
16              All right.
17              MR. RISTUCCIA:  Thank you, your Honor.
18              Your Honor, this case is in no way moot.  I would
19   like to remind the Court, your Honor, that mootness is a burden
20   on the defendant's side.  They must prove what the Supreme
21   Court has called a formidable burden of showing that it's
22   absolutely clear that the alleged wrongful behavior could not
23   reasonably be expected to occur, and they have by no means met
24   this burden.
25              Indeed, defendants themselves in their opposition
```

admit implicitly that this case is not moot.  They claim that
two of the three of the injunctions that we've asked for before
this Court are moot, but they give various merit-based reasons
why this Court should reject the third one which they admit
would operate against their current 2024 Flag Policy just as it
would against their past previous repealed 2022 Flag Policy.

        That is a concession that this case is not moot.  If
this Court can grant some relief that would operate against the
defendants, then it is in fact not moot.

        THE COURT:  Would that leave just one piece of the
case that's not moot?

        MR. RISTUCCIA:  It is the plaintiffs' position, as I
will go on, your Honor, to explain, that in fact there's
significantly more that is not moot, both another one of the
two requested injunctions, as well as of course our request for
declaratory relief and nominal damages, all of which are not --

        THE COURT:  So with regard to the preliminary
injunction, one of the requests that the plaintiffs are asking
for is that the Court enjoin the 2022 policy.  So how is that
not moot?

        MR. RISTUCCIA:  So that is the second of the three.

        We agree that the 2022 Flag Policy has been repealed
and that in that sense is moot.

        Even on that request, your Honor, this Court does
still have the authority to enjoin a reversion to the 2022 Flag

1    Policy or to enjoin the shutting down of the forum itself.

2        Various courts have found that if a forum is shut

3    down for viewpoint discriminatory reasons, that shutting down

4    of a public forum itself can be enjoined, and that would

5    certainly be within this Court's possibility and within this

6    Court's power.

7        However, the first of our three as well as -- the

8    third is the one that they themselves confess is not moot.

9        The first of our requested injunctive relief

10   requested this Court enjoin any viewpoint discrimination

11   against flag applications of any sort regardless of whether

12   that viewpoint discrimination occurs through the 2022 policy or

13   through some other policy.

14       And it is clear that flag requests are still fully

15   possible, indeed are encouraged on their own current website,

16   as I'll show your Honor in a moment, and, thus, flag requests

17   are still -- theoretically can still be made.  My clients have

18   declared they will still make them, and they would still be

19   discriminated against under the current policy on the basis of

20   viewpoint.

21       Your Honor, if I can show an exhibit or two?  Your

22   Honor, these are ones that have already been filed.

23       Looking at Exhibit M here, this is the current

24   website, Nashua's current website.  This is after their repeal

25   of the 2022 policy.

1          And going down, your Honor, they have at the top of

2    it, first, a City Hall Plaza Events Policy, using almost

3    exactly the same words as the former 2022 Flag Policy, stating

4    that they will prevent any applications for a ceremony on the

5    plaza which, "expresses a message that is not in harmony with

6    city policies and messages the city wishes to express or

7    endorse."

8          They also state that they will not allow any

9    ceremonies on the plaza if those are contrary to the city's --

10         THE COURT:  But how does that relate to the flag

11   policy?  Because that's the policy you're challenging, right?

12         MR. RISTUCCIA:  Yes, your Honor.  I will give a

13   moment, your Honor, on that.

14         They also specifically state on the flag policy that

15   in order to submit for approval you should follow the

16   guidelines and procedures provided below.

17         Going below, your Honor, to those specific

18   guidelines and procedures, they then give three links.  One

19   link is to their current flag policy, the one that was passed

20   October the 7th, and the other is the 2022 Special Events

21   Application and the 2022 Special Events Procedures.  These are

22   the exact same special events applications, your Honor, and

23   special events procedures that my client applied using on all

24   three of the applications, the flag applications still at

25   issue, and all three documents -- two documents still

1    specifically discuss flag requests.

2                THE COURT:  Slow down a little bit.

3                MR. RISTUCCIA:  I'm sorry, your Honor.

4                THE COURT:  That's okay.

5                MR. RISTUCCIA:  Both of these documents that are

6    still on their website, and in fact are being encouraged to be

7    used, explicitly discuss flag requests.  So the flag requests

8    are encouraged on their own website.

9                The other two I would like to show, your Honor, are

10   those other two.  Here is the current special events procedure.

11   Again, the one that is linked to on the website.  It's filed as

12   Exhibit E.

13               And going down, your Honor, you will see that they

14   have still a lengthy discussion of how to make requests for the

15   use of the city flagpole on this very procedure that they are

16   -- on their website, and they are encouraging and in fact

17   telling people to use.

18               And the last is the specific form.  This is just one

19   example.  Many versions of this form have been filed.  This is

20   the particular one that my client, Mr. Scaer, used when

21   applying for his Detransition Awareness flag.

22               And again, if you notice, it's a little hard to see,

23   it specifically addresses flag requests as well as ceremonies.

24   So if you want to have a ceremony, you're supposed to apply

25   using this.  If you want to have a flag flown as part of that

1    ceremony, you should apply using this.  Far from indicating

2    that they will no longer accept any flag applications.

3    Therefore, they are encouraging on their website the continuing

4    requests of city -- to use the city flagpole.

5            Those requests admittedly will no longer be judged

6    using the 2022 Flag Policy, but we have not only challenged the

7    2022 Flag Policy.  We've been challenging viewpoint

8    discrimination in general.  And whether or not they

9    discriminated against my client's flag applications on the 2022

10   Flag Policy versus on the 2024 Flag Policy or the 2024 City

11   Plaza Events Policy makes no difference to the requested relief

12   we asked.  It is the viewpoint discrimination that we are

13   asking this Court enjoin, not the specific policy.

14           THE COURT:  Because when I look at your prayers for

15   relief in your complaint, it says you are looking for a

16   preliminary permanent injunction related to denying flag

17   applications and preventing flags from being flown on the

18   citizen flagpole, enforcing the Nashua flagpole policy, and

19   denying removing any flag because of a citizen complaint.

20           MR. RISTUCCIA:  Correct, your Honor.

21           THE COURT:  That's all focused on the flag policy.

22           MR. RISTUCCIA:  If you look, your Honor, at our

23   proposed order, they have been divided out into three separate

24   requests for injunctive relief.

25           Perhaps I wrote -- that was written perhaps poorly

1      at the end of the plaintiffs' motion, but it's quite clear on

2      the proposed order we're asking for three separate preliminary

3      injunctions.

4              One for denying flag applications, any flags from

5      being flown on the citizen flag policy on the basis of

6      viewpoint, one asking for an injunction of the city's 2022

7      flagpole policy, and the third about denying or removing any

8      flag because a citizen complains or it has been deemed

9      offensive by city officials.  So three separate injunctions.

10             As the defendants themselves concede in their

11     opposition, they state that two of these they claim are moot,

12     but they admit the third is in fact not moot but would still

13     operate even on their 2024 flagpole policy.

14             Plaintiff is simply saying that number one would

15     also fully operate on their current policies.  It is only the

16     second of the two that would be moot because of the repeal of

17     that policy.

18             THE COURT:  Okay.

19             MR. RISTUCCIA:  We also question to what extent this

20     repeal has occurred.  There's no question that the 2022 policy

21     has been taken down, and as they've stated, it has been

22     repealed, but there's been some mixed messages from defendants

23     themselves.  Defendant's own counsel stated to a reporter that

24     this was only a clarification and not an outright change.  So

25     it is unclear to me exactly how those two are both true.

1   Admittedly, it's possible that there was some sort of --

2           THE COURT:  Well, hasn't their position been from

3   the outset, though, that this is government speech, and so

4   wouldn't that be consistent with that position?

5           MR. RISTUCCIA:  It still would mean that -- there's

6   always been government speech, and that would certainly be

7   consistent.  What was being said to the reporter seemed to be

8   that this was not a new policy but a clarification of the old

9   policy.  And if this is just a rewriting that clarifies

10  language, that would imply that even the '22 Flag Policy is

11  still really just the 2024 Flag Policy clarified and that even

12  our second form of relief then would operate.

13          There also has been no legislative appeal of any

14  kind of this flag policy.  There's simply, as they admit in

15  their opposition, an action that was taken by Mayor Donchess

16  himself under his own authority.  He is the only one who signed

17  the new policy.  He has chosen to revoke the '22 Flag Policy.

18          But the aldermen have not voted in any way to make

19  this change.  One of the aldermen has in fact recently called

20  for a legislative appeal because he's concerned about this

21  issue that there's not been an official legislative appeal.

22          And because there has been no legislative appeal,

23  Mayor Donchess can restore the 2022 Flag Policy just as quickly

24  and simply as he revoked the 2022 Flag Policy.

25          We would ask then for an injunction preventing such

1    a reversion to the 2022 policy of one that we sued to enjoin,

2    without which -- it would be too easy for the government to

3    simply manipulate this just briefly -- by mooting something

4    briefly in order to avoid judicial review and with every

5    intention to return to a prior policy once this Court has made

6    its decision.

7             As a result, we don't feel -- the plaintiff claims

8    that this is not close in any way to meeting the burden.  This

9    is a formidable burden that has not been met when their own

10   website is clearly stating that people can continue to apply.

11   Regardless of whether those applications would be denied or

12   accepted, that the applications are fully possible and can be

13   discriminated against based on viewpoint, which is what we're

14   asking for an injunction against.

15            THE COURT:  All right.  Thank you.

16            Let me hear from the defendants on mootness.

17            Then I'll come back to you on your merits argument.

18            MR. RISTUCCIA:  Thank you, your Honor.

19            THE COURT:  Thank you.

20            MR. BARNES:  Thank you, your Honor.

21            It's the city's position that when the 2024 policy

22   repealed all prior policies, that this matter was mooted.

23            They're looking for an injunction.  We're here

24   because they want to impose the plaintiffs' will on the city, a

25   lot of what the injunctive relief that they're seeking, and our

1    position is tantamount to compelled speech, which is --

2    everything says -- the allegations contained in their

3    complaint.

4            There is no danger -- given the current policy that

5    has repealed the prior policy, there's no danger that the city

6    is going to go back on -- if this matter were to be dismissed,

7    that it's not in the city's interest to do so.

8            They've presented no evidence that the city has

9    plans to go back to a prior policy.  This isn't a situation

10   where they've announced a moratorium on raising flags.  It's a

11   permanent repeal.

12           The Mayor's Office has always been in control of the

13   policies concerning the flag.  There's no aldermatic action

14   despite what some single alderman might want to do.  I don't

15   think that this is a compelling reason to find that this is not

16   moot.

17           THE COURT:  But is it sufficient for the mayor who

18   has discretionary authority to change the policy, as he's done

19   a couple of times in this case, just to say I've changed it now

20   to the 2024 policy?

21           There's no evidence here before me in the record

22   that he's not going to change it again.  So is that sufficient

23   for me based on this record to say that voluntary succession is

24   satisfied and this case is moot?

25           MR. BARNES:  I think there is.  Because the whole

1    purpose of enacting the 2022 policy -- I could even go back.

2    The whole purpose of the policy that preceded the 2022 policy

3    was to comport with the law that the First Circuit handed down

4    in <u>Shurtleff</u>.  And then when that was overturned by the Supreme

5    Court, the city changed their policy again.

6              And the whole purpose of this evolving policy is to

7    make it abundantly clear to everybody that it's government

8    speech.  And, unfortunately, that wasn't clear to the

9    plaintiffs and we're here today.

10             And so the policy was repealed because it's not in

11   the city's best interests to have these disruptions.  The city

12   has multiple types of things that they need to handle on any

13   given day, and they don't need to be burdened by things like

14   this.

15             There have been other cases where they have found

16   noncommercial disruptive speech in advertising on the side of a

17   metro train car to be -- it's perfectly reasonable for the

18   government to keep that out, and that's what the city is

19   attempting to do here by exercising its government speech.

20             THE COURT:  So if the Court agrees with you that

21   there's some elements that may be mooted by the 2024 policy

22   change, what remains in the case if anything?

23             MR. BARNES:  I don't think anything remains.

24   Potentially, the nominal damages, but then that raises the

25   question of whether this Court has jurisdiction because --

1    there's a three-part test that requires that there be federal

2    law, that the government officials are acting in their official

3    capacity, and that they're looking for prospective relief, and

4    if there's no prospective relief, you're just looking at past

5    conduct.  I don't think the Court has jurisdiction to hear

6    that.  I think we're at state court at that point.

7                 THE COURT:  Okay.  All right.

8                 Anything else on the mootness argument?

9                 MR. BARNES:  There is one thing.  It's sort of

10   tangentially related to something my brother said.

11                 There's a matter of Rhames versus City of Biddeford,

12   and in that case there was a public access channel that the

13   government allowed its citizens to use and there was some

14   controversy involving some of the citizens, and they put a

15   moratorium on the access to the cable channel until they could

16   craft some sort of guidelines onto what type of programming was

17   allowed, and the District of Maine found that that was

18   permissible.  Their reasoning for doing so is they said that --

19   despite the -- I'm sorry.  They said that:  Because Biddeford

20   has no obligation to operate a public access channel, the Court

21   finds that the plaintiff has not shown a likelihood of success

22   on the merits of his claim.

23                 I think that case is applicable here.  They haven't

24   demonstrated that the plaintiffs or any citizen is entitled or

25   that the city is obligated to provide them with a flag-raising

1    program.  So I don't think that they can succeed on the merits

2    based on that.

3              THE COURT:  So as it relates to mootness, one other

4    question.

5              Going back to the exhibits that counsel showed

6    regarding the City Hall Plaza policy, why does the fact that

7    that policy is still in place and it still has language similar

8    to the 2022 policy not act as a kind of stop to the mootness

9    argument?

10              MR. BARNES:  Understood.

11              Well, your Honor kind of touched on it earlier.

12    They're talking about a city hall ceremony out front.  It has

13    nothing to do with flags.

14              THE COURT:  Right.  But isn't that evidence, though,

15    that the city could still go back to the 2022 policy and that

16    the mayor is just making this discretionary change now to stop

17    a lawsuit?

18              MR. BARNES:  I don't think so, your Honor, and the

19    reason being is that, as the Shurtleff Court noted, when a flag

20    is raised in front of -- as the speech of government is

21    generally thought of as government speech, but a citizen

22    standing in front of city hall waving a flag and speaking

23    whatever they want into a megaphone is probably going to be

24    attributed to the citizen and not the government.  So there's

25    less of a concern that the government is going to be embroiled

1    in any kind of controversy or that it's going to be disruptive

2    to their day-to-day business because somebody got out front and

3    started saying, you know, whatever they felt they needed to

4    say.

5              THE COURT:  All right.  Thank you.

6              Anything else on mootness?

7              MR. BARNES:  No, ma'am.

8              THE COURT:  All right.

9              Attorney Ristuccia, anything else on the mootness

10   argument before you move on to the merits?

11             MR. RISTUCCIA:  May I just respond briefly to the

12   question of qualified immunity, your Honor, since that was

13   brought up?

14             I just wanted to point out, your Honor, first of

15   all, there are no state claims in this case so there would be

16   nothing to send back to state court, you know, if all the

17   claims, the federal claims are dismissed.

18             Moreover, qualified immunity has not in any way been

19   decided, it has not been in any way briefed, and it would not

20   cover the city of Nashua itself, which is not in fact -- we've

21   asked for claims against the city of Nashua as well as against

22   all the individual defendants.  Qualified immunity at most

23   covers all of the individual defendants not of the city of

24   Nashua.  So even if qualified immunity were granted, there

25   would still in fact be a nominal damages claim against the city

1  of Nashua that would prevent this court case from being mooted.

2            THE COURT:  Okay.  All right.

3            Let's move into the merits of the argument.

4            I'm going to reserve my decision on the mootness

5  decision.

6            MR. RISTUCCIA:  Thank you, your Honor.

7            Nashua has said today that this flagpole is

8  government speech.  That's not surprising.  They've been saying

9  this flagpole and the flags on it are government speech at

10  least since 2020 despite the fact that they've changed their

11  policy by my count four times in the course of that process.

12  Every time they change the policy they insist that it was

13  government speech and that it was government speech even under

14  the old policy.  They continue to say that the old policy, the

15  2022 policy, was constitutional and that it was government

16  speech under that policy, too.

17            Rather, the goal of keeping the change of this

18  policy is that whenever they realize there's some sort of legal

19  problem and that their past policy does not in fact cohere with

20  Shurtleff or does not in fact cohere with how Shurtleff has

21  been applied by the lower courts, then they make a change but

22  say, well, the change is just a clarification, we actually will

23  always just government speech because the history and public

24  perception of a --

25            THE COURT:  But aren't they entitled to make changes

 1    that comply with the law?

 2              MR. RISTUCCIA:  Absolutely.

 3              THE COURT:  If their policy is now out of

 4    compliance, isn't it their obligation to update that policy to

 5    make it in compliance?

 6              MR. RISTUCCIA:  It is absolutely allowed for any

 7    government to change the policies that affect, in particular, a

 8    limited public forum, and plaintiff is not by any means

 9    suggesting otherwise.

10              However, when judging government speech, the Supreme

11    Court has made clear that history and public perception, two of

12    the three factors of the government speech test, look quite

13    broadly at history and public perception in general and

14    includes past events as well as present policies.

15              The defendant cannot argue at least under specific

16    Supreme Court precedent that this Court should only look at,

17    for example, the history of the 2024 policy that currently is

18    standing or for that matter the history of only the 2022

19    policy.

20              The Supreme Court in Shurtleff went back all the way

21    to the Middle Ages when it was trying to discuss the history

22    prong of its analysis.  And courts have made a clear

23    distinction between the general history of a particular type of

24    expression and the specific history of the particular policy at

25    issue.

1          I point the Court, for example, to the Cajune case,

2     which is 105 F.4th 1170 from the Eighth Circuit, which

3     discusses the difference between general history and specific

4     history quite well, though this is also discussed in Shurtleff

5     itself at 254.

6          I would also point this Court to the McCreary County

7     case.  The McCreary County case was an establishment clause

8     case, not a First Amendment free speech case, but it was a case

9     about government speech.  It was specifically a case where

10    there was a government display and one of the parties argued

11    this display was a limited public forum and the other party

12    argued the display was government speech.  And the government

13    there argued, just as defendants are arguing, that only the

14    last policy should be looked at.  The one that's currently

15    under operation.  In that case that would be the 2024 policy,

16    but the Court rejected this argument and found that all three

17    of the policies that had been instituted in a series in that

18    case should be looked at when evaluating whether or not the

19    particular forum was government speech or a limited public

20    forum.

21         To quote from the McCreary case, which, by the way,

22    is 545 U.S. 844, to quote from it -- 866, "The world is not

23    made brand new every morning."  "Reasonable observers have

24    reasonable memories, and our precedents sensibly forbid an

25    observer to turn a blind eye to the context in which the policy

arose."

In this case the context was a flag policy that went back all the way to 2017, in which a wide variety of flags were flown.  Many of which are not sensibly -- could not sensibly be construed as government speech and in fact would be inappropriate for a government to state, such as religious flags like the Lutheran Rose flag or the Christian flag that were flown only six months ago.  But that these flags were flown, were perceived by the public as having been flown, would have naturally be understood to be the speech of the particular applicant, not of the government itself.

The government does not play any active role in shaping the flags that fly on the flagpole.  The flags are provided by the applicants.  They are designed by the applicants or at least they are often raised by the applicants.  Government officials often do not attend the flag-raising ceremony.  They don't organize those ceremonies.  They don't necessarily speak at those ceremonies.  After a flag is flown, applicants are free to come and collect their flag and take it home.  It remains their property.

To quote the Shurtleff decision and a section that was cited by the defendants themselves, this is at 270 -- it's actually from the Alito concurring opinion, but it was cited by the defendants as the standard.  "For the adopted expression to qualify as the government's, the private party must alienate

1    control over the medium of expression to the government."

2    "Otherwise, the government is simply providing a forum."

3          There's been no alienation of control over these

4    flags when the flags are the property of the applicant who

5    provides them, who flies them, who takes them home at the end.

6    The only thing that is in the government's control is whether

7    or not those flags get approved or denied.

8          In this case all three factors in the government's

9    speech test clearly point that this is an individual speech on

10   a limited public forum or perhaps a nonpublic forum.

11   Plaintiffs would argue this is a limited public forum.  It fits

12   the class and criteria of being a forum that's been opened up

13   for a particular range of speakers or a particular range of

14   expression.  In this case, expression that celebrates a

15   particular anniversary or a particular heritage or a special

16   accomplishment or that pushes for some cause.  That is a

17   standard language for a limited public forum.

18         But even if it's a nonpublic forum, the standard

19   that this Court would apply would be same.  In fact, nonpublic

20   forums and limited public forums, as the First Circuit has

21   recognized, are essentially equivalent.

22         And the defendants themselves acknowledge at one

23   point that this is -- they concede that it is a nonpublic

24   forum.  They state this on page 10 of their most recent

25   opposition which, if I could quote from, your Honor, states

1   quite clearly this is a nonpublic forum.  Quoting from page 10

2   of the defendant's opposition:  "The city's 2022 Flag Policy

3   specifically states that this potential use of this city's flag

4   pole is not intended to serve as a forum for the expression by

5   the public (emphasis added).  As such, under that policy the

6   city's flagpoles were a nonpublic forum and continue to be so

7   under the 2024 City Hall Flagpole Policy."

8           Right there a concession this is a nonpublic forum,

9   and, as such, speech on it must -- any regulation of speech on

10  it must be both viewpoint neutral and reasonable in light of

11  the purpose of the particular forum.

12          In this case neither of those requirements were met.

13  It is certainly not viewpoint neutral.  The 2022 policy quite

14  explicitly allows, in fact encourages, discrimination on

15  viewpoint.  Its messages are exactly what they object to.  Any

16  message that the city does not wish to endorse or express can

17  be prevented from being flown, as well as any message that is

18  contrary to the city's best interest or that supports a -- that

19  does not support a "worthy cause."

20          Worthiness -- whether something is in the city's

21  best interest or whether something is a message that the cities

22  wish to endorse or express are straightforward cases of

23  viewpoint discriminatory regulation.

24          It is also unreasonable for the city to insist that

25  particular anniversaries are acceptable and other particular

1    anniversaries are not when their own flag policy simply says

2    anniversaries and causes.

3         My clients applied on the three flags at issue here.

4    All three of them were in honor of particular anniversaries.

5         The Save Women's Sports flag, for example, was in

6    honor of the 50th anniversary of Title IX.  That is an

7    anniversary and a wish to be commemorated by my clients, and it

8    is unreasonable for them to insist that that type of

9    anniversary is not acceptable when it fully fits within the

10   criteria that their own flag policy lays out.

11        Public perception also clearly points to the fact

12   that this is not government speech but rather the speech of the

13   particular applicant.

14        Even the name Citizen Flagpole, which was widely

15   used, was on the website of the city for many years and is

16   still widely used today, including by government officials,

17   shows that this is a flagpole for citizens.  And though this

18   phrase admittedly is no longer on their website, I'm not sure

19   when it was removed, it is still used by government officials.

20   It was used by defendant Deshaies in an e-mail in December --

21        THE COURT:  Counsel, I'm just going to ask you to

22   slow down for the court reporter.  Thank you.

23        MR. RISTUCCIA:  This name Citizen Flagpole was used

24   by defendant Deshaies herself in December of 2023.

25        It was used by Kathleen Palmer, as the record shows,

1    who is the mayor's own events coordinator.  In May 2023 when

2    Kathleen Palmer was applying on the mayor's behalf to use the

3    flagpole, she still referred to this flagpole as a citizen

4    flagpole.

5           It was used by an alderman just a week ago in a

6    newsletter sent to that alderman's constituencies discussing

7    the flagpole, and he repeatedly refers to it as the citizen

8    flagpole.  It's used by -- many of the flag applicants

9    themselves refer to it as such in their applications as the

10   record clearly shows.

11          The record has not been called into question in any

12   way by defendants.  They have not pushed against the record or

13   said that these are somehow inauthentic documents, but they

14   admitted that these are genuine documents and simply said, for

15   example, that defendant Deshaies misspoke when she -- or used

16   it by accident when she referred to the phrase Citizen Flag

17   Pole.  This name is common, it was once official, and it is

18   still widely used.  That goes to public perception and shows

19   that regular people who are hearing government officials call

20   it the citizen flagpole are going to think that citizens can

21   use this flagpole and that the flags on the pole are flown by

22   citizens.  Particularly when they look and see ceremonies

23   raising those flags in which no government official appears and

24   which the citizen who applied to use the flag is raising that

25   flag and giving a speech and often quite -- and sometimes a

1    quite anti-Nashua speech at that ceremony.

2          Again, in the _Shurtleff_ decision the Supreme Court

3    specifically acknowledged that the ceremonies used to raise

4    flags does in fact go into interpreting whether or not that

5    flagpole is government speech or a limited public forum under

6    the public perception factor of that test.

7          As such, the history, the public perception, and the

8    active shaping of this flagpole all show that this is not in

9    fact government speech but is citizen speech and citizen speech

10   that's being discriminated against on the basis of viewpoint.

11         Plaintiff has also argued and continues to argue

12   that the current policies being used by Nashua also violate the

13   doctrine of prior restraint, of vagueness, and of overbreadth,

14   and all three of those types of First Amendment tests apply to

15   limited public forum and to nonpublic forum alike.  They're not

16   just for limited public forum.

17         Since Nashua itself has conceded at least this is a

18   nonpublic forum, and we have argued that this in fact a limited

19   public forum, those tests would still apply, and they cannot

20   justify the boundless discretion, the unbridled discretion

21   that's being given to government officials in deciding what

22   flags should fly on this pole or not.

23         THE COURT:  Does the analysis change as it relates

24   to government speech versus limited public or nonpublic speech

25   if the city were to also have some kind of internal guidance as

1   to how the policy were to be implemented, meaning what is

2   harmonious with the city message, what is against the city

3   interests?

4           MR. RISTUCCIA:  So if the flag is government speech,

5   your Honor, then none of these -- the First Amendment does not

6   apply to government speech as we recognize.

7           THE COURT:  Right.

8           MR. RISTUCCIA:  If it is a nonpublic forum versus a

9   limited public forum, such internal guidance might prevent

10  there from being unbridled discretion, but it would still be

11  vague if the -- since vagueness is judged based on the

12  reasonable citizen or the reasonable observer.

13          THE COURT:  I guess my question is more so under

14  Shurtleff.

15          Would having some more guidance to go along with the

16  policy convert this policy to a government speech and not the

17  limited public forum that you're arguing?

18          MR. RISTUCCIA:  I certainly think there are things

19  that Nashua could do to make this pole into government speech.

20          If they prevented any flags other than government

21  flags from flying on it, for example, your Honor.  Every

22  limited forum and every nonpublic forum can be shut down by the

23  government if they take --

24          THE COURT:  That wasn't really the requirement of

25  that case.  The requirement was really, as I read it, that the

1    government has -- the city has some kind of policy and maybe

2    some other internal policies that would clarify or instruct as

3    to how the policy would be carried out.

4                    MR. RISTUCCIA:  Yes, your Honor.

5                    The holding in that case was that if they had a

6    policy sufficient in order to meet all three factors, that it

7    would be government speech.

8                    And the Court held up particularly the policy being

9    used by the city of San Jose as being an example of the kind of

10   policy that was sufficiently developed and showed a level of

11   control and shaping of the flagpole by the city sufficient to

12   qualify as government speech.

13                   If you compare the San Jose policy, though, to the

14   2022 policy, it is remarkable how dissimilar the two are alike.

15   San Jose had a strict list of particular flags that could be

16   flown.  It must be a flag from that list, not any other flag.

17   And they also limited who was allowed to apply.  It actually

18   somewhat depended on the particular flag.  If a particular

19   flag, for example the Flag of Foreign Nation, was to be flown,

20   and many such Foreign Nation flags have been flown at Nashua in

21   honor of Irish Independence Day, for example, or Indian

22   Independence Day, those flags could only be applied for by a

23   city official, and it had to be one of a list of countries,

24   countries that had been recognized as countries by the United

25   States government.  Only those countries of those flags.  So

1  not, for example, the flag of Kurdistan which was flown on the

2  Nashua flagpole.  That was not a government-recognized country.

3  It would not have been allowed under the San Jose flagpole

4  policy.

5           So these two policies are quite different, and by no

6  means has the 2022 policy reached anything like the level of

7  control and shaping that the San Jose policy evidenced.

8           THE COURT:  I'm sorry.  I'm just looking for -- I

9  know that you all provided the San Jose policy in your

10  briefing, but I can't recall which briefing it was attached to.

11           MR. RISTUCCIA:  So it was not attached as an

12  exhibit, your Honor, only the section, you know, the Supreme

13  Court discussion was attached.  However, the link was attached

14  with --

15           THE COURT:  Okay.

16           MR. RISTUCCIA:  And the link is in our reply brief.

17  I don't remember the exact page, but I can find it for you if

18  you want, your Honor.

19           THE COURT:  That's all right.  Thank you.  That's

20  enough direction for me.  Thank you.  I remember seeing it.

21           MR. RISTUCCIA:  And that link was simply taken from

22  the particular amicus brief that San Jose filed.

23           So as a result, your Honor, the history prong also

24  clearly points to this being government speech, not -- sorry --

25  being citizen speech, not government speech, despite the fact

1  that the San Jose policy was approved.  It's a very different

2  issue.

3          It is true that Nashua claims that they designed

4  their current -- well, not the current.  The 2022 Flag Policy

5  was allegedly designed to mirror the San Jose policy, but it

6  does not mirror it closely at all, your Honor.

7          As a result, all three factors go towards the point

8  of this is government speech -- this is citizen speech, not

9  government speech.

10          Any other questions, your Honor?

11          THE COURT:  No.  I don't have any other questions on

12  that.  Thank you.

13          All right.  Counsel.

14          MR. BARNES:  Thank you, your Honor.

15          THE COURT:  I guess my first question for you is,

16  you know, the message -- I mean, it's clear to me that it seems

17  like what the city was trying to do was make this government

18  speech at least through the 2024 policy, maybe earlier.  But

19  when I'm looking at the 2022 policy, does the message that the

20  city intends to convey have to be more specific than just in

21  harmony with the city policies and not against city interests?

22  I mean, that seems really broad, right, and discretionary.

23          MR. BARNES:  I don't know that it's that broad

24  because there's four categories that it lays out ahead of time.

25  Cultural events, substantial achievement, worthy cause, and

1    anniversary.

2            I mean, my brother would have you believe that we

3    can raise the Nazi flag to commemorate Hitler's birthday.  I

4    think that's totally unreasonable, and it certainly wouldn't be

5    in the city's best interests to do that.

6            THE COURT:  Well, certainly, though, doesn't the

7    Pine Tree flag commemorate an anniversary?

8            MR. BARNES:  It did once upon a time, your Honor.

9    Unfortunately, it's been misappropriated.  There's been

10   numerous news articles that talk about how that has been

11   misappropriated by far-right groups as some sort of symbol of,

12   you know --

13           THE COURT:  How is a citizen supposed to know that a

14   flag that's been subverted in meaning, even if it fits within

15   one of the categories under the policy, is no longer acceptable

16   until they get the denial notice?  What guidance does the city

17   provide for that beforehand or even internal guidance?  I mean,

18   I don't have any evidence that there's even internal guidance.

19           MR. BARNES:  I think that when it's government

20   speech, I don't know that you need to have, as my brother

21   suggested, as much guidance as, say, the city of San Jose has

22   done.  I think you just have to demonstrate that there's some

23   control there, and I think the policy achieves that end.

24           THE COURT:  I guess my -- I guess I'm not really

25   sure that there's control here.  That's what I'm getting at.

1    If there's no real internal policies that guide you as to how

2    you would implement this policy, how is there control?  So

3    meaning, if your -- if Ms. Deshaies were to review the policy

4    and get an application that suggests an anniversary, how would

5    she know whether it's an anniversary that's appropriate to

6    celebrate or not?

7         MR. BARNES:  I think that there's discussion with

8    the mayor who is -- the Mayor's Office has always been in

9    control of the flag policy, and is that a message that this

10   administration wants to convey?  Is there a problem with it?

11        It's not just the Scaers' applications that have

12   been denied.  I submitted some exhibits yesterday that shows

13   that an individual wanted to fly the Palestinian flag, and that

14   was denied because, again, it's not in the city's best

15   interests to wade into that controversy between Israel and

16   Palestine.  It's just too disruptive to the ongoing day-to-day

17   business.

18        So what Shurtleff made clear was that -- you know,

19   you look at the history, and they recognize the history as the

20   seat of government, it's typically government speech, but it

21   was critical for the city of Boston because its flag policy --

22   well, there really wasn't one.  There was no written policy

23   whatsoever.  So that was their concern.  They didn't say that

24   you needed to have a policy exactly like the city of San

25   Jose's.  They used it as an illustrative example of saying this

1    is a city that has a policy.

2           So as long as there's some written policy to give a

3    person of reasonable intelligence an idea of what would and

4    would not be acceptable, then it's government speech.

5           THE COURT:  Okay.  Well, assuming it's not, what's

6    your -- you know, I've read your brief, obviously, so I know

7    you have other arguments as it relates to the constitutional

8    challenges of overbreadth and vagueness.

9           Is there anything else you want to highlight in that

10   regard?

11          MR. BARNES:  Well, I mean, I don't think we get

12   there because I think it's government speech and there's the

13   mootness issue.

14          But with respect to viewpoint discrimination, the

15   city of Nashua doesn't believe that it's in its best interests

16   to raise flags that are blatantly controversial that can

17   disrupt city business.

18          And in American Freedom Defense Initiative versus

19   Washington Metro Area Transit Authority, the citation is

20   91 F.3d 356, that's out of the D.C. Circuit Court, it was

21   decided in 2018, they said that -- in that case the Court held

22   that limiting their advertising space to "less controversial

23   advertising did not rise to viewpoint discrimination," and

24   that's what the city has done here.

25          And with respect to prior restraint, New England

1    <u>Regional Council of Carpenters</u>, you know, in that case the
2    Supreme Court upheld a total ban on leafletting in a particular
3    nonpublic forum.  That's what has happened here with the 2024
4    policy.  And if you go by the 2022 policy, that's even more
5    narrow than an outright ban on flag raising.
6             And with vagueness, the issue of vagueness, the
7    whole point of trying to avoid vagueness is to run afoul of the
8    law unknowingly, but that would never happen here because they
9    would apply ahead of time and then the city would accept or
10   reject the flag ahead of time.
11            THE COURT:  Right.  But the fact that you have
12   applied without knowing the circumstances under which the city
13   would reject your application, doesn't that suggest the law is
14   vague?  So if I don't know what Mayor Donchess would feel is
15   inappropriate for the city, doesn't that make the policy vague?
16            MR. BARNES:  I don't think it makes it unreasonably
17   vague.  There has to be some criteria, and the city has
18   established some criteria, and it certainly -- I know with the
19   2024 policy there is no vagueness argument whatsoever, but
20   under the 2022 policy you have the four categories that the
21   city is looking for and then best interests, and I think a
22   person exercising some common sense about who's in office and
23   the kind of messages that they get behind could come to the
24   conclusion about what is and isn't acceptable and what is and
25   isn't considered to be disruptive to --

1          THE COURT:  But isn't that viewpoint discrimination

2     if you're trying to focus on who's in office and what's

3     acceptable?  Wouldn't that be focusing on the viewpoint that's

4     acceptable to the person in office?

5          MR. BARNES:  I don't think it's the viewpoint.  I

6     think it's the subject matter that they want to steer away from

7     in order to not disrupt, you know, what's going to be

8     controversial here.

9          I mean, take the Palestinian flag, for example.  If

10    someone applied to fly the Israel flag, I would say you would

11    probably reject that, too, because it's just -- you don't want

12    to wade into those waters.  You want to be able to conduct your

13    city business without getting inundated with angry phones,

14    e-mails, and people threatening you on Twitter, or X, whatever

15    it's called now.

16         THE COURT:  Well, certainly, though -- I mean, I

17    think at one point the city accepted the Pride flag.  That's

18    still a controversial position.

19         MR. BARNES:  Yes, but the -- as -- one moment, your

20    Honor.

21         (Pause)

22         So in American Freedom Defense Initiative the ban on

23    less controversial advertising was upheld.  It wasn't all

24    controversial advertising.

25         So in the grand scheme of things, you know, there

1    are Pride flags flown all over the country.  The White House

2    lights up with the colors in June.  There are parades all over

3    the country.  There might be some people that are upset by

4    that, but there are some people that are upset by the American

5    flag.  They would sooner have, you know, the Soviet flag fly.

6    Most reasonable citizens don't find that subject matter to be

7    controversial.

8                THE COURT:  The Pride flag?

9                MR. BARNES:  Correct.

10               THE COURT:  I think some reasonable citizens may

11   disagree, right?

12               MR. BARNES:  Some might, but it's less controversial

13   than, say, a swastika.

14               THE COURT:  Okay.  Anything else?

15               MR. BARNES:  I don't believe so, your Honor, unless

16   you have other questions for me.

17               THE COURT:  I don't think I do.

18               Anything else from plaintiffs' counsel?

19               MR. RISTUCCIA:  I would merely respond to the issue

20   of controversy that was just brought up by defendant.

21               THE COURT:  Certainly.

22               MR. RISTUCCIA:  So defendants are claiming that it

23   is reasonable for them to deny flags if those flags are

24   controversial or at least extremely controversial or like a

25   Nazi flag or apparently the Palestinian flag.

1          We think that the fact that they denied the

2    Palestinian flag is another great example of their viewpoint

3    discriminatory behavior.

4          While my particular clients by no means agree with

5    the gentleman who flew the Palestinian -- wanted to fly the

6    Palestinian flag, we believe he should have been allowed to fly

7    the flag and that that was a legitimate opinion of a citizen

8    that was viewpoint discriminated against.

9          And we have stated in our briefing from the start

10    that we've never claimed that they are only discriminating

11    against conservative voices.  The city is discriminating

12    against voices on either the right or the left if they find

13    those viewpoints to be controversial or extreme, as they admit.

14    That is exactly viewpoint discrimination to say anything on

15    either of the sort of edges out.  We will only take stuff

16    that's in the middle.

17          Moreover, they cite a 2018 D.C. Circuit case

18    claiming that regulations against controversy is reasonable.  I

19    would note, your Honor, that that case is prior to the Supreme

20    Court's 2019 Brunetti decision which sort of redefined or at

21    least clarified what viewpoint discrimination is.  So prior

22    cases before Brunetti are quite unreliable about understanding

23    what qualifies as viewpoint versus content-based

24    discrimination.  This court case is not mooted and it does not

25    fit with what the recent Fikre case requires for mootness, and

1    we look forward to the Court's decision on this.

2              THE COURT:  All right.  Thank you.

3              Anything from any other defendants or anyone else?

4              MR. CALLAGHAN:  No, your Honor.

5              MR. PIGNATELLI:  No, your Honor.  Thank you.

6              THE COURT:  All right.  Thank you.

7              All right.  I'll take this motion under advisement,

8    and I'll get an order out as soon as I can.

9              Thank you.  Court is adjourned.

10             (Conclusion of hearing 11:29 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

        I, Susan M. Bateman, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings to the best of my knowledge, skill, ability and belief.


Submitted:  12-10-24    /s/   Susan M. Bateman _____
                        SUSAN M. BATEMAN, RPR, CRR