# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

Bethany R. Scaer and Stephen
Scaer

               v.                           Civil No. 24-cv-00277-LM-TSM

City of Nashua, a municipal
Corporation; James W. Donchess,
Mayor, City of Nashua, in his official
and individual capacities; Jennifer L.
Deshaies, Risk Manager, City of Nashua,
in her official and individual capacities

## REPORT AND RECOMMENDATION ON
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

This case involves a flagpole in front of City Hall in Nashua, New Hampshire ("City" or "Nashua"), which was known as the "Citizen Flag Pole" and was reserved for community members who obtained City approval to fly a flag to support their cultural heritage, observe an anniversary, honor a special accomplishment, or support a worthy cause.[1]  In May 2022, Nashua adopted a written flagpole policy (the "2022 Flagpole Policy") under which the City expressly reserved the right to deny permission to fly any flag on the Citizen Flag Pole that was not in harmony with City policies or was contrary to the City's best interest.  Plaintiffs Bethany R. Scaer and Stephen Scaer are residents of Nashua who were denied permission to fly certain flags on the Citizen Flag Pole. They contend that the City, in refusing their requests to fly those flags, discriminated against the viewpoints expressed by the flags and violated their constitutional right to free speech.  On

---

[1] For ease of reference, this court refers to the flagpole at issue as the "Citizen Flag Pole" even though Nashua abandoned that description.  However, the court's use of this term is not intended to express an opinion as to whether the public's use of the flagpole during the relevant time period constituted private speech or government speech.

September 6, 2024, the Scaers brought this civil rights action, pursuant to 42 U.S.C. § 1983, against Nashua, its Risk Manager, Jennifer L. Deshaies ("Deshaies"), and its Mayor, James W. Donchess ("Donchess"). In their complaint, the Scaers challenge Nashua's 2022 Flagpole Policy under the First and Fourteen Amendments. They also seek injunctive relief, declaratory relief, and nominal damages, as well as attorney's fees and costs pursuant to 42 U.S.C. § 1988.

The matter is before the undersigned magistrate judge for a report and recommendation on Plaintiffs' Motion for Preliminary Injunction (Doc. No. 2). Initially, the Scaers requested an order enjoining the City, in relevant part, from denying flag applications and preventing flags from being flown on the Citizen Flag Pole on the basis of viewpoint, including any viewpoint that "is deemed to be offensive by city officials[,]" and from enforcing certain portions of the 2022 Flagpole Policy. However, on October 7, 2024, before defendants filed their opposition to the preliminary injunction motion, Nashua adopted a new flagpole policy (the "2024 Flagpole Policy"), which repealed "[a]ll previous policies related to flagpoles on city hall grounds" and provides in significant part that all flagpoles on the grounds of Nashua's City Hall "are not public fora open to others for expression but are solely for city government to convey messages it chooses." Defendants argue that the change in policy renders the proposed injunctive relief moot. Plaintiffs disagree and argue that defendants fail to satisfy their burden of establishing mootness. Accordingly, plaintiffs urge the court to issue a preliminary injunction "enjoining Defendants from denying Plaintiffs' applications under their City Hall Plaza Events policy, from restoring their 2022 flagpole policy, or from closing the Citizen Flag Pole as a forum entirely[.]"

After consideration of the parties' written submissions and the oral arguments presented during the November 5, 2024 hearing, the court concludes that the motion for a preliminary injunction is not moot. The court also concludes, however, that the Scaers failed to show that they are likely to succeed on the merits of their claims because the undisputed facts indicate that the

flags displayed on the Citizen Flag Pole under the 2022 Flagpole Policy were government speech that is not regulated by the First Amendment.  Accordingly, and for all the reasons set forth herein, this court recommends that the District Judge deny the Scaers' motion for a preliminary injunction.

## BACKGROUND[2]

### *The Parties*

Plaintiff Bethany R. Scaer ("Beth") resides in Nashua, where she has lived for three decades.  Beth Decl. at ¶ 1.  She is active in state and local politics, and writes for the *GraniteGrok*, a political website that advocates for limited government and the defense of liberty.  Id. at ¶ 2. Beth describes herself as a proponent of various political positions, including "gender-critical feminism, parental rights, women's sex-based rights, legislation restricting pediatric gender medicine, the Pro-Life movement, and the freedoms protected in the Bill of Rights."  Id. at ¶ 3. She has repeatedly expressed criticism of Nashua's mayor, defendant James Donchess.  Id.

Plaintiff Stephen Scaer ("Stephen") is Beth's spouse.  Stephen Decl. at ¶ 1.  Like Beth, Stephen has resided in Nashua for three decades and is active in both state and local politics.  Id. at ¶¶ 1-2.  He writes for the *GraniteGrok* and engages in political rallies, government meetings, and sidewalk demonstrations, among other political activities.   Id. at ¶ 3.  Additionally, Stephen ran for state senate in 2022 and again in the recent 2024 election.  Id. at ¶ 2.  Stephen describes his platform as "defending First Amendment rights, protecting children from experimental gender

---

[2] The facts, which are undisputed, are drawn from the complaint (Doc. No. 1) ("Compl.") and from the following materials that were filed by the parties in connection with the motion for a preliminary injunction: (1) the Declaration of Stephen Scaer (Doc. No. 2-1) ("Stephen Decl."); (2) the Declaration of Bethany R. Scaer (Doc. No. 2-2) ("Beth Decl."); (3) Exhibits A-P filed in support of Plaintiff's Motion for Preliminary Injunction (Doc. Nos. 2-3 through 2-13, 26-2 through 26-4, and 28-1 through 28-2) ("Pl. Ex."); (4) Exhibit A filed in support of Defendants' Opposition to the Plaintiffs' Motion for Preliminary Injunction (Doc. No. 22) ("Def. Ex. A"); and (5) the Supplemental Declaration of Bethany R. Scaer (Doc. No. 26-1) ("Supp. Beth Decl.").

medicine, and ensuring women can have restrooms, locker rooms, sports teams, and prisons reserved exclusively for those of their biological sex." Id.

In addition to Nashua, the defendants include Donchess, who served as the City's Mayor at all times relevant to the events giving rise to this litigation, and Deshaies, who served as Nashua's Risk Manager throughout the relevant time period. Compl. at ¶¶ 4-5. The Scaers originally sued Donchess and Deshaies in both their official and individual capacities, but they subsequently dismissed the individual capacity claims. Doc. No. 23. Accordingly, plaintiffs' claims against the individual defendants are essentially claims against the City. See Kentucky v. Graham, 473 U.S. 159, 165-66 (1985) (explaining that official capacity suits "generally represent only another way of pleading an action against an entity of which [a defendant] is an agent." (quoting Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690 n. 55 (1978)); Traudt v. Lebanon Police Dep't, --- F. Supp. 3d ---, 2024 WL 4226915, at *3 (D.N.H. Sept. 18, 2024) (ruling that plaintiff's claims against police officer and Chief of Police in their official capacities were "indistinguishable from his claims against the City.").

### *Establishment of Nashua's Flagpole Program*

Nashua maintains four flagpoles of varying heights that are located on City property outside City Hall. Compl. at ¶ 8. The City uses three of those flagpoles to display government flags such as the American flag and the New Hampshire state flag. Id. This litigation arises from the use of the fourth flagpole, which Nashua previously referred to as the "Citizen Flag Pole." See id. at ¶ 9; Pl. Ex. A.

In 2017, Nashua established a program under which area residents could apply for approval to fly flags on the Citizen Flag Pole. See Beth Decl. at ¶ 7. Although the City had no written policy describing the program prior to 2022, as of October 2020, Nashua's website contained the following information:

4

**Citizen Flag Pole**

**Fly a Flag**
A pole in front of City Hall is reserved for the citizens of Nashua to fly a flag in support of their cultural heritage, observe an anniversary or honor a special accomplishment. Any group wishing to fly a flag must provide the flag.

Id. at ¶ 6; Pl. Ex. A. The website directed the public to contact the City's Risk Management office for further information. Pl. Ex. A.

Individuals and groups wishing to use the Citizen Flag Pole were required to submit a Special Events Application to the Risk Manager, who checked to ensure that no other applicant reserved the Citizen Flag Pole for the same time period. Beth Decl. at ¶ 8. Applicants had to confirm that they would abide by local ordinances and indemnify the City for any damages caused by their event. Id. Unless the City owned the flag that an applicant wished to fly, the applicant was responsible for providing the flag, which remained the applicant's property. Id. Applicants who obtained approval to fly a flag often raised the flag themselves, using a tool borrowed from the City. Id. at ¶ 10. Ordinarily, Nashua allowed approved flags to remain on the Citizen Flag Pole for approximately one week, after which time flag owners were free to retrieve their flags and take them home. Id. at ¶¶ 8-9.

Flag raisings on the Citizen Flag Pole were often, but not always, accompanied by short ceremonies at City Hall Plaza. Id. at ¶ 10. Applicants who wished to hold a ceremony were required to provide certain details on their Special Events Application, such as the expected number of attendees and the extent to which the event would obstruct the sidewalk. Id. Local politicians sometimes attended or even spoke at the ceremonies, which gave them an opportunity to interact with voters and constituents. Id. Over the years since the program began, groups of area residents have regularly flown flags in honor of Pride Month, Indian Independence Day, Brazilian Independence Day, Greek Independence Day, International Francophonie Day, and the

anniversary of the founding of Nashua's Lion's Club. Id. at ¶ 11; Stephen Decl. at ¶ 9. Other flags, which area residents have flown once or on occasion, include the Kurdistan flag, the Christian flag, the Lutheran flag, the Porcupine Party flag, and flags supporting National Recovery Month and organ donation. Beth Decl. at ¶ 12. Throughout the time period when the program remained in place, approximately ten flags were flown on the Citizen Flag Pole each year. Id. at ¶ 9.

### *Plaintiffs' Early Applications to Use the Citizen Flag Pole*

Beth first applied to use the Citizen Flag Pole in October 2017, when she sought to fly the Luther Rose flag to honor the 500th anniversary of the Protestant Reformation. Id. at ¶ 19. Nashua approved her application and the Scaers held a small flag-raising ceremony with approximately six attendees, none of whom represented the City. See id.; Stephen Decl. at ¶ 10. Beth provided the flag and raised it herself using a tool she borrowed from Nashua. Beth Decl. at ¶ 19.

In 2020, Beth applied for permission to fly another flag, which she describes as the "Save Women's Sports" flag. Beth Decl. at ¶ 21. The flag consisted of the words, "Save Women's Sports" and "Woman = Adult Human Female." See id. at ¶ 41; Pl. Ex. K. According to the Scaers, the flag expressed their belief "that women have inalienable rights based on their biological sex that governments have a duty to protect and that allowing biological males to compete against women in sports denies women their rights and the equality due them under both the U.S. Constitution and Title IX." Id. at ¶ 45; Stephen Decl. at ¶ 25. The City approved Beth's application and granted her permission to fly the flag from October 10, 2020 to October 16, 2020. Beth Decl. at ¶ 21.

On October 10, 2020, Beth and Stephen raised the Save Women's Sports flag on the Citizen Flag Pole, without a ceremony but with two other people attending and holding signs. Id.; Stephen Decl. at ¶ 12. Later that day, a Nashua City Alderwoman posted on her Facebook page that "Beth's hate flag" did not fit Nashua's requirements for flying a flag on the Citizen Flag Pole. Beth Decl.

6

at ¶ 24; Pl. Ex. F.  An unknown number of unidentified individuals also complained that the flag

was transphobic.  Beth Decl. at ¶ 22; Stephen Decl. at ¶ 13.  One day later, on October 11, 2020,

Nashua revoked its permission to fly the flag and removed it from the pole.  Id.  Beth appealed the

removal to Donchess, who denied her appeal.  Beth Decl. at ¶ 23; Stephen Decl. at ¶ 13.  In a

statement issued on October 14, 2020, Donchess explained that the flag was taken down because

it "contain[ed] a discriminatory message toward the transgender community[.]"  Beth Decl. at ¶

23.  He further stated that "Nashua is a welcoming community, in which we embrace all people

and the contributions of all are celebrated and valued."  Id.

Subsequently, the City conducted an investigation regarding Beth's application to fly the

Save Women's Sports flag on the Citizen Flag Pole.  See Pl. Ex. G.  In a letter to Beth's attorney

dated November 11, 2020, Nashua's Corporation Counsel stated that, upon investigation, the City

determined that the flag "was outside of the parameters established for use of the citizen flag pole."

Id.  He also stated in relevant part as follows:

> You have attempted to apply a public forum analysis to the City's actions.  It is the
> City's position that the proper approach is to view the use of the flag pole as
> "government speech" where the City has reserved the right to determine the
> message that will be attributed to it.  See, *Shurtleff v. Boston*, 928 F.3d 166 (1st Cir.
> 2019).[3]  Accordingly, your request for reconsideration on behalf of Ms. Scaer is
> denied.

Id. (footnote added).

During 2021, the City granted Beth's applications to use the Citizen Flag Pole on two

separate occasions.  In April 2021, Nashua allowed Beth to fly her Lutheran flag to commemorate

---

[3] In Shurtleff, the First Circuit Court of Appeals affirmed the district court's denial of plaintiffs'
motion for a preliminary injunction to prevent the City of Boston, Massachusetts from denying
them a permit to raise a "Christian flag" on a government-owned flagpole outside Boston's City
Hall.  The First Circuit concluded, in relevant part, that because Boston's choice of which flags
could be flown on its flagpole "likely convey[ed] government speech" rather than a limitation on
private speech, the plaintiffs failed to establish a likelihood of success on their claim for violation
of free speech against the City.  Shurtleff, 928 F.3d at 176.

the 500th anniversary of the Diet of Worms, an event relating to the history of the Protestant Reformation. Beth Decl. at ¶ 20; Stephen Decl. at ¶ 11. In August 2021, the City granted her permission to fly a flag in honor of the ratification of the Nineteenth Amendment. Beth Decl. at ¶ 28; Stephen Decl. at ¶ 14. The Scaers held flag-raising ceremonies on both occasions. Beth Decl. at ¶¶ 20, 28; Stephen Decl. at ¶¶ 11, 14. Fewer than twelve people, none of whom represented the City, attended the April 2021 ceremony, and no one other than the Scaers attended the August 2021 ceremony. Id.

### *Nashua's Adoption of the 2022 Flagpole Policy*

On May 2, 2022, the Supreme Court issued a decision in Shurtleff reversing the First Circuit Court of Appeals' ruling that the City of Boston did not violate the Constitution by refusing to allow a private group to raise a religious flag on a flagpole outside City Hall. Shurtleff v. City of Boston, Mass., 596 U.S. 243, 259 (2022). The Supreme Court determined that under the specific facts of the case, "Boston's flag-raising program does not express government speech" and as a result, "the city's refusal to let [a Christian organization] fly their flag based on its religious viewpoint violated the Free Speech Clause of the First Amendment." Id. In reaching its decision that Boston's flag-raising program involved private rather than government speech, the Court found it significant that Boston "had nothing − no written policies or clear internal guidance − about what flags groups could fly and what those flags would communicate." Id. at 257. The Court also emphasized that "Boston could easily have done more to make clear it wished to speak for itself by raising flags[,]" and it cited as an example, the City of San Jose, California's flag-flying program, which "provides in writing that its 'flagpoles are not intended to serve as a forum for free expression by the public,' and lists approved flags that may be flown 'as an expression of the City's official sentiments.'" Id. at 257-58 (additional quotations marks omitted) (quoting Brief for Commonwealth of Massachusetts et al. as *Amici Curiae* 18). The Supreme Court determined,

however, that Boston's "lack of meaningful involvement in the selection of flags or the crafting of their messages" led it to "classify the flag raisings as private, not government, speech[.]" <u>Id.</u> at 258.

On May 11, 2022, nine days after the <u>Shurtleff</u> decision, Nashua adopted the 2022 Flagpole Policy and posted it on its website. Compl. at ¶ 15; Pl. Ex. D. The Policy, which was signed by Donchess and Deshaies on behalf of the City, provided in substance as follows:

> A flag pole in front of City Hall may be provided for use by persons to fly a flag in support of cultural heritage, observe an anniversary, honor a special accomplishment, or support a worthy cause. Any group wishing to fly a flag must provide the flag. This potential use of a City flag pole is not intended to serve as a forum for free expression by the public. Any message sought to be permitted will be allowed only if it is in harmony with city policies and messages that the city wishes to express and endorse. This policy recognizes that a flag flown in front of City Hall will be deemed by many as City support for the sentiment thereby expressed, city administration reserves the right to deny permission or remove any flag it considers contrary to the City's best interest.

Pl. Exs. B and D. Thus, the 2022 Flagpole Policy incorporated language that was used by San Jose, California, and highlighted by the Supreme Court in <u>Shurtleff</u>. <u>See</u> <u>Shurtleff, 596 U.S. at 257-58</u>.

On or about the same time as it posted the 2022 Flagpole Policy, the City revised its "Special Events Procedures" to include a section entitled, "Request[s] for Use of the City Flag Pole." Beth Decl. at ¶ 17. That section provided in significant part that "[r]equests to fly a flag shall be made to the Risk Manager or designee and will be evaluated in accordance with the City's flag pole policy." Pl. Ex. E at 2. It also provided that "[a]pplications shall include a photograph of the flag proposed and an explanation of the message intended to be conveyed." <u>Id.</u> Although the Special Event Procedures contained no specific details regarding the types of flags that were permissible, they further stated that applications to fly a flag "shall be subject to review and approval of the [City's] Risk Manager." <u>Id.</u>

*Plaintiffs' Applications to Fly Flags Under the 2022 Flagpole Policy*

In May 2022, the same month in which Nashua posted its 2022 Flagpole Policy, Beth applied for permission to fly the Save Women's Sports flag on the Citizen Flag Pole to commemorate the 50th anniversary of Title IX.  Beth Decl. at ¶ 30.  The application was denied. Id.  Beth appealed to Nashua's Mayor and Donchess upheld the denial.  Id.  Later that month, one of Beth's friends, Laurie Ortolano, applied for permission to fly a Save Women's Sports flag, which differed from Beth's flag because it did not include the words, "Woman = Adult Human Female." Id. at ¶ 31.  Deshaies denied that application as well.  Id.

The Scaers' next attempts to use the Citizen Flag Pole occurred in 2024.  On February 7, 2024, Stephen applied for permission to fly a "Detransitioner Awareness" flag to commemorate "Detrans Awareness Day" on March 12, and to host a small flag-raising ceremony consisting of about five attendees.  Stephen Decl. at ¶ 16; Pl. Ex. J at 1.  According to Stephen, the Detransitioner Awareness flag was designed by an individual who underwent a gender detransition.  Stephen Decl. at ¶ 17.  It depicts a blue-green lizard against a black background and includes the words, "De-Trans Awareness" at the bottom of the flag.  Id.  The lizard was chosen due to the ability of some lizards to survive the loss of certain body parts and grow them back.  Id.  Stephen maintains that raising awareness about gender detransitioners and the difficulties they face are important to him, both personally and politically, and that "supporting detransitioners does not hurt transgender-identifying persons[.]"  Id. at ¶ 18.

On February 14, 2024, Stephen received a letter from Deshais denying his application to fly the Detransitioner Awareness flag.  Id. at ¶ 19; Pl. Ex. J at 2.  Therein, Deshais informed Stephen that "[t]he flag is not in harmony with the message that the City wishes to express and endorse. Therefore, we must deny your request as the flag poles are not intended to serve as a forum for free expression by the public."  Pl. Ex. J at 2.  Stephen appealed the denial of his application on

February 22, 2024, and on March 4, 2024, Donchess upheld Deshais' decision without further explanation. Id. at 3-4; Stephen Decl. at ¶ 19.

Subsequently, the Scaers were part of a group that flew the Christian flag and attended a small flag-raising ceremony during Holy Week 2024. Stephen Decl. at ¶ 15; Beth Decl. at ¶ 29. During the ceremony, two speakers, including the plaintiff in the Shurtleff litigation and a local pastor, expressed their views on "the need to reclaim America for Jesus Christ" and criticized Nashua for "flying flags that support progressive politics such as the Pride Flag while rejecting flags with conservative messages such as the Pro-Life Flag." Id. No one representing the City participated in or was present at this event. Id.

In late May 2024, Beth submitted an application to fly the "Pine Tree" flag on June 15, 2024, to commemorate the 249th anniversary of the Battle of Bunker Hill and to honor the soldiers from Nashua who fought and died during that conflict. Beth Decl. at ¶ 34; Pl. Ex. H at 3. The Pine Tree flag depicts a pine tree against a white background and contains the words, "An Appeal to Heaven" across the top of the flag. Pl. Ex. K at 2. According to Beth, the Pine Tree flag was carried by New England troops during the Battle of Bunker Hill and "is a key symbol of natural rights and resistance to tyranny." Beth Decl. at ¶ 36. The record also indicates that the flag was used during the January 6, 2020 attack on the United States Capitol Building in Washington, D.C. See Pl. Ex. O at 1.

On May 29, 2024, Deshaies sent Beth a letter denying her application. Pl. Ex. H at 3. As grounds for the denial, Deshaies stated that "[t]he flag is not in harmony with the message that the City wishes to express and endorse. Therefore, we must deny your request as the flag poles are not intended to serve as a forum for free expression by the public." Id. On June 3, 2024, Beth appealed the denial of her application, and on June 4, 2024, Donchess upheld Deshaies' decision.

Id. at 1-2; Beth Decl. at ¶ 37.  Although Donchess provided Beth with a copy of the 2022 Flagpole Policy, he provided no further explanation for the City's decision.  See Pl. Ex. H at 1.

Nashua's records relating to the use of the Citizen Flag Pole show that prior to the adoption of the 2022 Flagpole Policy, Nashua refused to allow only two flags to fly on the Citizen Flag Pole: the Save Women's Sports flag and a "Porcupine" flag that was associated with both the Free State Project and the Libertarian Party.[4]  Beth Decl. at ¶ 32.  The records also show that after Nashua adopted the 2022 Flagpole Policy, the City refused to allow the following flags to fly on the Citizen Flag Pole: the Save Women's Sports flag, the Pine Tree flag, the Detransitioner Awareness flag, a "Pro-Life" flag, and the Palestinian flag.  See id. at ¶¶ 31, 33; Pl. Ex. H at 1-3.  There is no dispute that Nashua's decisions regarding which flags could be flown on the Citizen Flag Pole under the 2022 Flagpole Policy were based on whether those messages "were in harmony with the City of Nashua's policies and messages that the City of Nashua wishes to express and endorse."  See Doc. No. 21 at 3.

### *Nashua's Adoption of the 2024 Flagpole Policy*

On September 6, 2024, the Scaers initiated this action challenging the constitutionality of the 2022 Flagpole Policy and defendants' application of that Policy.  Doc. No. 1.  They also filed the instant motion for preliminary injunction.  Doc. No. 2.  On October 7, 2024, three days before Nashua filed its opposition to plaintiffs' motion, Nashua's Mayor, Donchess, adopted a new flagpole policy – the 2024 Flagpole Policy – which reads in substance as follows:

> The flagpoles on city hall grounds shall henceforth be exclusively controlled by city government.  The city shall determine what flags will be flown and during what time periods and does not seek input from other sources.  The flagpoles are not public fora open to others for expression but are solely for city government to convey messages it chooses.

---

[4] Although Nashua allowed the Porcupine flag to fly on the Citizen Flag Pole in 2018, 2019 and 2020, it denied a February 2021 application to fly that flag.  Beth Decl. at ¶ 32.

All previous policies related to flagpoles on city hall grounds are hereby repealed.

Def. Ex. A.  Nashua announced the change in policy on its website, as part of the section entitled, "City Hall Plaza Events."  Supp. Beth Decl. at ¶¶ 6-7; Pl. Ex. M.  The parties dispute whether the new policy renders plaintiffs' motion for a preliminary injunction moot or whether plaintiffs are still entitled to pursue injunctive relief.

### Plaintiffs' Future Plans

Plaintiffs claim that if permitted, they will continue to fly flags expressing their views on the Citizen Flag Pole.  Beth Decl. at ¶ 42; Stephen Decl. at ¶ 22.  This would include the Pine Tree flag, the Save Women's Sports flag, the Detransitioner Awareness flag, and the Pro-Life flag, as well as other flags expressing their views on such issues as "gender-critical feminism, parental rights, women's sex-based rights, pediatric gender medicine, abortion, and the freedoms protected in the Bill of Rights."  Beth Decl. at ¶¶ 43-46; Stephen Decl. at ¶¶ 23-24.  Furthermore, Beth asserts that even if Nashua no longer allows members of the public to fly flags on the Citizen Flag Pole, she intends to apply to hold ceremonies at City Hall Plaza in support of the causes that are important to her.  Supp. Beth Decl. at ¶ 10.  Accordingly, she argues that a preliminary injunction remains necessary to protect her right to engage in free speech.

### The Proposed Injunction

The Scaers originally moved for a preliminary injunction enjoining the City, in essence, from denying flag applications and preventing flags from being flown on the Citizen Flag Pole on the basis of viewpoint, including any viewpoint that "is deemed to be offensive by city officials[,]" and from enforcing certain portions of the 2022 Flagpole Policy.  See Doc. No. 2-14 (proposed Order).  However, after Nashua adopted the 2024 Flagpole Policy and repealed the 2022 Flagpole Policy, plaintiffs altered their requested relief.  They now seek a preliminary injunction "enjoining Defendants from denying Plaintiffs' applications under their City Hall Plaza Events policy, from

restoring their 2022 [F]lagpole [P]olicy, or from closing the Citizen Flag Pole as a forum entirely." Doc. No. 26 at 8.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." Peoples Fed. Sav. Bank v. Peoples United Bank, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011)). In determining whether to grant a preliminary injunction, the district court must weigh the following four factors: "(1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing the injunction will burden the defendants less than denying an injunction would burden the plaintiffs and (4) the effect, if any, on the public interest." Sindicato Puertorriqueño de Trabajadores v. Fortuño, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (quoting Jean v. Mass. State Police, 492 F.3d 24, 26-27 (1st Cir. 2007)). "The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." Esso Standard Oil. Co. (Puerto Rico) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006).

The four factors "are not of equal prominence in the preliminary injunction calculus. The most important is whether the movant has demonstrated a likelihood of success on the merits – an element that [the First Circuit has] described as the 'sine qua non' of the preliminary injunction inquiry." Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 92 (1st Cir. 2020) (quoting Ryan v. U.S. Immigr. & Customs Enf't, 974 F.3d 9, 18-19 (1st Cir. 2020)). "If the movant fails to demonstrate a likelihood of success on the merits, the remaining elements are of little consequence." Id. Consequently, the court "need not address the other elements of the preliminary injunction framework" where a plaintiff "fail[s] to carry its burden of showing that it is likely to succeed on the merits of its claims[.]" Id. at 100.

**DISCUSSION**

I.    <u>**Mootness**</u>

Defendants assert that Nashua's adoption of the 2024 Flagpole Policy and repeal of the 2022 Flagpole Policy render plaintiffs' motion for a preliminary injunction moot.  Defendants argue that under the new policy, none of the City's flagpoles constitute a public forum and only the City government has the right to use them.  Doc. No. 21 at 20.  Therefore, they reason that the relief plaintiffs seek is no longer available and the motion for a preliminary injunction should be denied as moot.  <u>See</u> <u>id.</u>  The Scaers argue that their motion is not moot because defendants cannot satisfy their burden of showing that the allegedly unlawful behavior is not reasonably expected to recur and because the court is capable of granting them meaningful relief.  Doc. No. 26 at 7-10. For the reasons that follow, this court finds that the motion is not moot and that plaintiffs' request for a preliminary injunction must be addressed on the merits.

"Article III of the Constitution restricts [the federal court's] jurisdiction to 'Cases' and 'Controversies.'"  <u>In re Ruiz</u>, 83 F.4th 68, 73 (1st Cir. 2023) (quoting U.S. Const. art. III, § 2). This constitutional limitation "ensures that the parties before [the court] retain a 'personal stake' in the litigation."  <u>Moore v. Harper</u>, 600 U.S. 1, 14 (2023) (quoting <u>Baker v. Carr</u>, 369 U.S. 186, 204 (1962)).  "As '[a] corollary to this case-or-controversy requirement,' there must exist a dispute 'at all stages of review, not merely at the time the complaint is filed.'"  <u>Id.</u> (quoting <u>Genesis HealthCare Corp. v. Symczyk</u>, 569 U.S. 66, 71 (2013)).  The "[m]ootness doctrine 'addresses whether an intervening circumstance has deprived the plaintiff of a personal stake in the outcome of the lawsuit.'"  <u>Id.</u> (quoting <u>West Virginia v. EPA</u>, 597 U.S. 697, 719 (2022)).

"Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  <u>D.H.L. Assocs. v. O'Gorman</u>, 199 F.3d 50, 54 (1st Cir. 1999) (quoting <u>Powell v. McCormack</u>, 395 U.S. 486, 496 (1969)).  Defendants argue that

plaintiffs' motion is no longer live in the instant case due to the City's adoption of the 2024 Flagpole Policy.  Doc. No. 21 at 20.  The Complaint shows that each of plaintiffs' claims in this action is based on Nashua's 2022 Flagpole Policy, which was repealed and replaced by the 2024 Flagpole Policy.[5]  Ordinarily, a court lacks power to grant injunctive relief where the challenged policy no longer exists.  See D.H.L. Assocs., 199 F.3d at 54-55 (ruling that court was without power to grant injunctive and declaratory relief where municipal ordinances at issue no longer existed).  However, the Scaers rely on an exception to the mootness doctrine that applies where the defendant voluntarily ceases the challenged practice or repeals the challenged policy.  See Doc. No. 26 at 7-8.  They argue that this exception applies here because defendants failed to show that they will not restore the 2022 Flagpole Policy in the absence of a preliminary injunction.  See id. at 10.

 "It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'"  Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 189 (2000) (quoting City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982)).  In other words, it "does not make the case moot."  Towle v. N.H. Dep't of Corr., Comm'r, No. 06-cv-464-JL, 2008 WL 2080782, at *3

---

[5] The Complaint consists of four Counts challenging the constitutionality of the 2022 Flagpole Policy.  In Count One, plaintiffs allege that the 2022 Flagpole Policy "facially discriminates against speech that is not 'in harmony with city policies and messages that the city wishes to express and endorse' or that officials 'consider[ ] contrary to the City's best interest.'" Compl. at ¶ 59.  They further allege that defendants' implementation of the 2022 Flagpole Policy is "neither reasonable nor viewpoint neutral."  Id.  In Count Two, plaintiffs allege that defendants' implementation of the 2022 Flagpole Policy constitutes an unconstitutional prior restraint on the Scaers' free speech, and in Count Three they challenge the 2022 Flagpole Policy "as unconstitutionally vague" because it allows "arbitrary censorship of speech" defendants dislike and "gives excessive enforcement discretion to [C]ity leaders."  Id. at ¶¶ 62-65, 68.  Finally, in Count Four, plaintiffs allege that the 2022 Flagpole Policy is unconstitutionally overbroad because it allows City administrators to bar "vast amounts of protected political expression" by empowering them "to deny permission or remove any flag [they] consider[ ] contrary to the City's best interest."  Id. at ¶ 72.

(D.N.H. May 14, 2008) (quoting United States v. W.T. Grant Co., 345 U.S. 629, 632 (1953)).  This

is because a dismissal on mootness grounds would "leave the defendant free to return to his old

ways."  Friends of the Earth, 528 U.S. at 189 (quotations, alteration, citation and punctuation

omitted).  On the other hand, "[a] case might become moot if subsequent events made it absolutely

clear that the allegedly wrongful behavior could not reasonably be expected to recur."  Id. (quoting

United States v. Concentrated Phospate Export Ass'n, 393 U.S. 199, 203 (1968)).  In such cases,

"'[t]he heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be

expected to start up again lies with the party asserting mootness."  Id. (second alteration in original)

(quoting Concentrated Phospate Export Ass'n, 393 U.S. at 203).  Defendants in the instant case

fail to satisfy that burden.

A governmental entity such as the City may be entitled "to a presumption of mootness"

where a policy change eliminating the allegedly improper behavior is made through legislation or

legislative-like procedures.  Thomas v. City of Memphis, Tenn., 996 F.3d 318, 324-25 (6th Cir.

2021); see also Towle, 2008 WL 2080782, at *4 (concluding that Department of Corrections'

administrative overhaul to its regulations rendered plaintiff's request for an injunction moot).

Where such a presumption applies, the governmental entity "need not do much more than simply

represent that it would not return to the challenged policies."  Thomas, 996 F.3d at 324 (quoting

Speech First, Inc. v. Schlissel, 939 F.3d 756, 768 (6th Cir. 2019)).  However, no such presumption

applies when "'the discretion to effect the changes lies with one agency or individual, or there are

no formal processes required to effect the change[.]'"  Id. (quoting Speech First, 939 F.3d at 768).

Here, it is undisputed that the decision to repeal Nashua's 2022 Flagpole Policy and replace it with

the 2024 Flagpole Policy was made by one individual−defendant Donchess.  To render the motion

moot, therefore, defendants must make it "absolutely clear" that the 2022 Flag Pole Policy will not

be reinstated.  Friends of the Earth, 528 U.S. at 189 (quoting Concentrated Phosphate Export Ass'n,

393 U.S. at 203).

Defendants present no specific evidence showing that Nashua has no intention of

reinstating the 2022 Flagpole Policy or that the adoption of a similar policy cannot reasonably be

expected to occur.[6]  For instance, defendants provide no information indicating that Donchess has

no plans to revive the 2022 Flagpole Policy or that he lacks discretion to reinstate it.  Nor do they

present facts showing that there are other limitations in place to prevent him from using such

discretion.  Additionally, defendants do not concede that the challenged Policy was improper.

Rather, Nashua maintains that the 2022 Flagpole Policy was constitutional and that the 2024

Flagpole Policy merely clarifies the City's position that since 2022, the Citizen Flag Pole has

served as a forum for government speech rather than a public forum for private speech.  See Pl.

Ex. P; Doc. No. 21 at 1-3, 9-11.  These assertions undermine any suggestion that in the absence of

a preliminary injunction, it is absolutely clear that the City will not revert to its prior policy or

implement a similar policy at some point in the future.[7]  Accordingly, plaintiffs' motion is not

moot and the court must turn to the merits of their request for a preliminary injunction.

---

[6] During oral argument on the motion for preliminary injunction, Nashua's counsel argued that the
City has no incentive to reinstate the 2022 Flagpole Policy.  However, there is no evidentiary
support for counsel's assertion, which is insufficient to meet defendants' burden of proof on the
question whether the allegedly unconstitutional behavior is reasonably expected to recur.

[7] Although Nashua repealed its 2022 Flagpole Policy in October 2024, it maintained a policy
regarding events at City Hall Plaza that contains nearly identical language as the 2022 Flagpole
Policy.  See Pl. Ex. M.  That policy provides:

> The plaza in front of City Hall may be provided for use by persons or group[s] to
> have an event.  This potential use of the City Hall Plaza is not intended to serve as
> a forum for free expression by the public.  Any message sought to be permitted will
> be allowed only if it is in harmony with city policies and messages that the city
> wishes to express and endorse.  This policy recognizes that an event in front of City
> Hall will be deemed by many as City support for the sentiment thereby expressed,
> city administration reserves the right to deny permission it considers contrary to the

## II.    <u>Likelihood of Success on the Merits</u>

"In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." <u>Sindicato Puertorriqueño de Trabajadores, 699 F.3d at 10</u>. Thus, the court must consider this factor "before moving on to the remaining prongs of its analysis." <u>Id.</u> at 11.  "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success – rather, they must establish a 'strong likelihood' that they will ultimately prevail." <u>Id.</u> at 10 (quoting <u>Respect Maine PAC v. McKee, 622 F.3d 13, 15 (1st Cir. 2010)</u>).  In this case, the Scaers have not made the requisite showing, and therefore, the District Judge should deny their motion for preliminary injunctive relief.

### A.    <u>The nature of the speech at issue</u>.

The critical issue in determining whether the Scaers are likely to succeed on the merits of their claims is whether the display of flags on the Citizen Flag Pole under the 2022 Flagpole Policy constituted government speech or private speech.  The Free Speech Clause of the First Amendment "restricts government regulation of private speech; it does not regulate government speech." <u>Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 467 (2009)</u>.  Therefore, "[w]hen the government encourages diverse expression – say, by creating a forum for debate – the First Amendment prevents it from discriminating against speakers based on their viewpoint.  But when the government speaks for itself, the First Amendment does not demand airtime for all views" and the government is free to control the nature of its speech. <u>Shurtleff, 596 U.S. at 247-48</u> (internal citation omitted).  In the instant case, defendants argue that the 2022 Flagpole Policy and the City's

---

City's best interest.  All City Hall Plaza Events must be submitted for approval and follow all guidelines and procedures provided below.

<u>Id.</u>  The City's decision to keep this policy in place, even after plaintiffs challenged its similarly worded flagpole policy, undermines the conclusion that Nashua will not reinstate the 2022 Flagpole Policy at some point in the future.

implementation of that Policy cannot be deemed unconstitutional, and plaintiffs cannot establish a likelihood of success on the merits of any of their claims, because the speech in question was government speech.  See Doc. No. 21 at 4-8.  Plaintiffs contend, however, that "the flags displayed on the Citizen Flag Pole [were] private speech" and that Nashua's ability to reject their proposed flags, based on the viewpoints the flags expressed, rendered the 2022 Flagpole Policy unconstitutional.  Doc. No. 2 at 1-2, 8-10; Doc. No. 26 at 5-7.

The fact that Nashua invited members of the public to apply for permission to fly their own flags on the Citizen Flag Pole does not resolve the issue whether flags flown pursuant to the 2022 Flagpole Policy constituted government or private speech.  See Shurtleff, 596 U.S. at 254 ("The flying of a flag other than a government's own can also convey a governmental message.").   To answer this question, the court must "conduct a holistic inquiry designed to determine whether [Nashua] intend[ed] to speak for itself or to regulate private expression."  Id. at 252.  In Shurtleff, where the Supreme Court addressed this precise question, the Court relied on the following factors to guide its analysis: "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression."  Id.  This court concludes that these factors, taken together, indicate that the flags displayed on the Citizen Flag Pole pursuant to 2022 Flagpole Policy constituted government speech.

B.    The history of the Citizen Flag Pole.

"In evaluating the history factor, courts look to the medium of speech used and its historical ties to government."  Metroplex Atheists v. City of Forth Worth, No. 4:23-cv-00736-O, 2023 WL 5025020, at *3 (N.D. Tex. Aug. 6, 2023).  See also Shurtleff, 596 U.S. at 253-55 (considering "the history of flag flying, particularly at the seat of government."); Walker v. Texas Div., Sons of Confederate Veterans, Inc., 576 U.S. 200, 210-12 (describing states' historical use of license plates

to convey messages); Summum, 555 U.S. at 470-72 (describing governments' historical use of monuments on government land). Where, as in this case, the speech involves a flag display, it is appropriate to consider both the general history of flag displays, "particularly at the seat of government[,]" and the specific flag flying program at issue. See Shurtleff, 596 U.S. at 253-55 (considering both "the history of flag-flying, particularly at the seat of government" and "the details of *this* flag-flying program" (emphasis in original)). Although the general history of flag flying on government property favors Nashua, the specific history of the Citizen Flag Pole is somewhat more nuanced because the City's policy changed over time.

As the Supreme Court explained in Shurtleff, throughout the course of history, governments have used flags to represent their communities and convey government messages. See Shurtleff, 596 U.S. at 253-55. Indeed, municipalities often use flags to symbolize their cities and communicate with the surrounding community. See id. at 254-55 (describing Boston's use of flags on City Hall Plaza to convey the city's messages). This is especially true where, as in this case, flags are displayed at the seat of municipal, state, or federal government. See id. (discussing history of flag flying, "particularly at the seat of government[,]" as a means of conveying the government's message). Here, the undisputed evidence shows that Nashua uses the flagpoles located outside City Hall to display government flags such as the American flag and the New Hampshire flag. Compl. at ¶ 8. Therefore, the City follows a long tradition of using its flagpoles to engage in government speech.

With respect to the history of the specific flagpole at issue in this case, there is no indication that anyone other than the City selected the flags that were flown on the Citizen Flag Pole prior to 2017. It was only at that time, when Nashua established a program to allow members of the public to apply for approval to fly flags on the Citizen Flag Pole, that the City created a means for citizen input regarding the flags displayed on City Hall property. See Beth Decl. at ¶ 7. The Scaers rely

21

on this program to argue that "historically, the Citizen Flag Pole was a forum for citizen speech[.]" Doc. 2 at 10. However, defendants contend that "Plaintiffs conspicuously focus only on the history of the flagpole *before* [the Supreme Court's decision in] <u>Shurtleff</u> was decided in 2022 and *before* the City adopted the 2022 Flagpole Policy at the heart of this matter." Doc. No. 21 at 6 (emphasis in original). They argue that the 2022 Flagpole Policy "marked a change in the characteristics of the flags flown outside City Hall" and "if the flags flown were once private speech, as of 2022, the City clearly claimed them as its own speech." <u>Id.</u>

The record supports defendants' argument regarding the full history of the Citizen Flag Pole. In 2017, when the City initiated its flag program, Nashua officials asserted almost no control over the flags displayed on the Citizen Flag Pole. Although the City established some limitations by reserving the Citizen Flag Pole "for the citizens of Nashua to fly a flag in support of their cultural heritage, observe an anniversary or honor a special accomplishment[,]" there is no evidence that Nashua participated in the selection of the flags displayed on the flagpole or that it intended to use the Citizen Flag Pole to promote its own messages or policies. <u>See</u> Pl. Ex. A. The only other requirements were unrelated to the messages or viewpoints that the flags were intended to convey. <u>See id.</u> (requiring any group seeking to fly a flag to provide the flag); Beth Decl. at ¶ 8 (requiring applicants to submit a Special Events Application to the Risk Manager, who determined whether the flagpole was available, and to confirm that they would abide by local ordinances and indemnify the City for any damages caused by their event). Furthermore, during the period between the establishment of the flag program in 2017 and the adoption of the 2022 Flagpole Policy, Nashua refused to fly a citizen's flag on only two occasions – on October 11, 2020, when it revoked its approval of Beth's application to fly the Save Women's Sports flag following complaints that it was transphobic, and in February 2021, when it rejected a request to fly the Porcupine flag. <u>See</u> Beth Decl. at ¶¶ 22-23, 32. Accordingly, there is little evidence to

suggest that the flags conveyed any government messages or that Nashua made much of an effort to shape and control the nature of the speech.  See Matal v. Tam, 582 U.S. 218, 235-37 (2017) (finding it "far-fetched" to suggest that registration of a trademark makes the mark government speech where the government does not create or edit the marks, does not evaluate whether the viewpoint conveyed by the mark is consistent with government policy, and does not endorse the mark when it issues a trademark registration).  It appears, therefore, that the Citizen Flag Pole initially served as a means for private expression.

However, the evidence demonstrates that Nashua's approach to the Citizen Flag Pole changed significantly with the adoption of the 2022 Flagpole Policy.  In addition to limiting the display of flags to those used to signify "cultural heritage, observe an anniversary, honor a special accomplishment, or support a worthy cause[,]" the 2022 Flagpole Policy expressly disclaimed the City's intent to create "a forum for free expression by the public."  Pl. Exs. B and D.  By adding this language, Nashua manifested an intent to comply with the Supreme Court's decision in Shurtleff and to use the Citizen Flag Pole to convey government speech.  See Shurtleff, 596 U.S. at 257 (describing San Jose, California's flag policy, which "provides in writing that its 'flagpoles are not intended to serve as a forum for free expression by the public[,]'" as an example of government speech (quotations and citation omitted)).  The 2022 Flagpole Policy also provided that "[a]ny message sought to be permitted will be allowed only if it is in harmony with [C]ity policies and messages that the [C]ity wishes to express and endorse[,]" and it reserved Nashua's "right to deny permission or remove any flag it consider[ed] contrary to the City's best interest."  Pl. Exs. B and D.  Thus, the City indicated that it would review applications to ensure that the viewpoints expressed by the applicants' flags, and the messages they conveyed to the public, were consistent with those of the City.

Nashua's 2022 revisions to its Special Events Procedures further illustrate the City's efforts to control the messages conveyed under its 2022 Flagpole Policy. By requiring applicants who wished to use the Citizen Flag Pole to "include a photograph of the flag proposed and an explanation of the message intended to be conveyed[,]" Nashua established a procedure for ensuring that the flags reflected its own viewpoints. See Pl. Ex. E at 2. Further, by declaring that applications to fly a flag "shall be subject to review and approval of the [City's] Risk Manager[,]" Nashua made it clear that the City, rather than the applicants, would have final authority over the nature of the flags displayed on its flagpole. See id. Therefore, the record indicates that in 2022, Nashua converted the Citizen Flag Pole from a vehicle for private speech into a means of conveying government-approved messages. See Summum, 555 U.S. at 472-73 (finding that privately financed and donated monuments that city accepted and displayed to the public in municipal park represented government speech where the city "effectively controlled the messages sent by the monuments in the Park by exercising final approval authority over their selection." (internal quotations and citation omitted)); Feldman v. Denver Pub. Schools, No. 23-cv-02986-RMR-STV, 2024 WL 4308189, at *3 (D. Colo. Sept. 26, 2024) (evidence showing that school officials retained authority over which flags could hang on public school walls supported a determination that historical use of the forum weighed in favor of government speech); Metroplex Atheists, 2023 WL 5025020, at *5 (concluding that history of city banner policy supported a finding that challenged banners were government speech where city retained sole authority to approve banner applications, city maintained exclusive control over the areas where banners were hung, and city had exclusive oversight of the municipal banner program).

It is undisputed that Nashua has exerted increasing control over the flags displayed on the Citizen Flag Pole since 2022. The record demonstrates that the 2022 Flagpole Policy remained in force until October 7, 2024, when Nashua eliminated the Citizen Flag Pole program altogether

with the adoption of the 2024 Flagpole Policy. <u>See</u> Def. Ex. A. Therein, the City declared that all the flagpoles on city hall grounds "shall henceforth be exclusively controlled by city government[,]" that the City alone would "determine what flags will be flown[,]" and that it would not seek input from the public or any other sources. <u>Id.</u>  Moreover, Nashua specified that "[t]he flagpoles are not public fora open to others for expression but are solely for city government to convey messages it chooses." <u>Id.</u>  Under the terms of the 2024 Flag Pole Policy, therefore, flags displayed on the Citizen Flag Pole convey government speech.

Although plaintiffs' characterization of the Citizen Flag Pole as a forum for private speech accurately describes the history of Nashua's flag policy in the earlier portion of its existence, the record demonstrates that the City changed course in 2022. Since its adoption of the 2022 Flagpole Policy at issue in this case, the City has allowed only those flags "that it wants to display for the purpose of presenting the image of the City that it wishes to project to all who frequent [City Hall.]" <u>See</u> <u>Summum</u>, 555 U.S. at 473. Therefore, this court concludes that under the circumstances presented in this case, the Scaers have not demonstrated that they are likely to prevail in showing that the historic factor weighs in favor of private speech.

     C.    <u>The public's likely perception of who is speaking</u>.

The next factor the court considers is "whether the public would tend to view the speech at issue as the government's." <u>Shurtleff</u>, 596 U.S. at 255. Plaintiffs argue that Nashua's residents "likely perceive the flags on the Citizen Flag Pole as private speech – as the pole's name implies." Doc. No. 2 at 11. Defendants argue that common sense dictates otherwise, especially because "any flag flown in front of City Hall is on City property." Doc. No. 21 at 7. This court concludes that at this early stage in the litigation, the public perception factor favors neither party, and therefore, plaintiffs have not shown that they are likely to prevail with respect to this factor.

25

The parties agree that the Citizen Flag Pole is one of four flagpoles located at Nashua's City Hall, just outside the entrance to the City's seat of government, and that Nashua uses the remaining flagpoles to display government flags. Compl. at ¶ 8. In this context, the flags displayed on the City's flagpoles may reasonably be perceived as helping to "defin[e] the identity that [the] city projects to its own residents and to the outside world." Shurtleff, 596 U.S. at 255 (second alteration in original) (quoting Summum, 555 U.S. at 472)). Consequently, "the public seems likely to see the flags as 'conveying some message' on the government's 'behalf.'" Id. (quoting Walker, 576 U.S. at 212 (additional quotations and citation omitted). Nashua specifically acknowledged this likelihood when it stated in its 2022 Flagpole Policy "that a flag flown in front of City Hall will be deemed by many as City support for the sentiment thereby expressed[.]" Pl. Exs. B and D.

The Scaers disagree that members of the public were likely to view the flags on the Citizen Flag Pole as government speech during the time period when the City's flag program was in place. They argue that since 2017, the Citizen Flag Pole has displayed flags conveying a range of viewpoints, "including some that would be strange or inappropriate for a city to express" such as religious and libertarian flags. Doc. No. 2 at 11. They also argue that the flags displayed on the Citizen Flag Pole were raised by private citizens who often accompanied flag-raising events with private ceremonies, without any City representatives present, during which attendees sometimes expressed controversial views. Id. Thus, they contend that an objective observer would have viewed the flags on the Citizen Flag Pole as expressing private speech.

Shurtleff provides some support for plaintiffs' argument. In that case, the Supreme Court considered evidence showing that private citizens often accompanied flag raisings with ceremonies that they conducted at the base of the city's flagpole. See Shurtleff, 596 U.S. at 255. The Court agreed that "a pedestrian glimpsing a flag other than Boston's" on the flagpole in question "might

simply look down onto the [City Hall] plaza, see a group of private citizens conducting a ceremony without the city's presence, and associate the new flag with them, not Boston." Id. Therefore, the Court concluded that "even if the public would ordinarily associate a flag's message with Boston, that is not necessarily true for the flags at issue here." Id. The same may reasonably be said about the flags on Nashua's Citizen Flag Pole.

Nevertheless, the evidence presented here could also support the conclusion that the public was likely to associate the flags with the views and sentiments of the City. Although flag raisings on the Citizen Flag Pole were often accompanied by ceremonies at City Hall Plaza, flags were sometimes raised without any accompanying ceremony or event. See Stephen Decl. at ¶ 7; Beth Decl. at ¶ 10. In the latter scenario, an observer might have reasonably viewed the Citizen Flag Pole, like the other flagpoles at City Hall, as expressing the City's views. Notably, it is also undisputed that local politicians sometimes attended and spoke at the flag-raising ceremonies, and when local ethnic communities raised a flag on the Citizen's Flag Pole, defendant Donchess usually attended the event to show his support for the community and strengthen his political network. Stephen Decl. at ¶¶ 7-8. Members of the public who observed those events may have reasonably associated those flag raisings with the views of the City and its mayor. Therefore, the circumstances surrounding the ceremonies favor neither party.

The fact that the flags on the Citizen Flag Pole reflected a range of perspectives similarly supports neither party. On the one hand, as plaintiffs argue, "[a] viewer is unlikely to think, for instance, that Nashua has an official position about whether Kurdistan should be independent from Iraq; whether the Free State Project and the growth of the Libertarian Party benefits New Hampshire; or whether the Protestant Reformation marked the birth of religious freedom." Doc. No. 2 at 11. Similarly, a viewer might reasonably have concluded that flags raised on the "Citizen" flagpole and representing a wide variety of cultures, events, and causes reflected the backgrounds

27

and views of Nashua's community members rather than the City's views or policies. On the other hand, a viewer may have just as easily concluded that "[t]he City . . . selected those [flags] that it wants to display for the purpose of presenting the image of the City that it wishes to project to all who frequent [City Hall.]" Summum, 555 U.S. at 473. For example, the public may have viewed the flags on the Citizen Flag Pole as a means by which the City celebrated its diverse community. It might also have viewed the flags as a way for Nashua to portray itself as a welcoming community for individuals of various backgrounds and beliefs.[8] As the Supreme Court observed in Summum, "[i]t certainly is not common for property owners to open up their property . . . [to] convey a message with which they do not wish to be associated." Id. at 471. Given the Citizen Flag Pole's location at City Hall, especially when combined with its proximity to three other flagpoles belonging to and controlled by the City, viewers could reasonably interpret the flags "as conveying some message on the [City's] behalf" and therefore reflecting government speech. See id.; see also Metroplex Atheists, 2023 WL 5025020, at *6 (finding that organizations' use of city poles to display banners under municipal banner policy "clearly implies" the city's endorsement of the messages conveyed by the banners "to anyone walking down the street."). In short, this court finds that at this stage in the litigation, the public perception factor favors neither party. Consequently, the Scaers failed to show a likelihood of success in this regard.

---

[8] Plaintiffs argue that members of the public who viewed the Christian or Luther Rose flags on the Citizen Flag Pole likely associated those flags with private speech rather than government speech because, under the Establishment Clause of the First Amendment, "[a] city cannot use government speech and resources to subtly pressure citizens into supporting Protestant Christianity or Christianity in general." Doc. 2 at 12. However, this court finds that it is too speculative to conclude that individuals who viewed those flags performed any such analysis or that their concerns about the Establishment Clause led them to draw any conclusions about the nature of the speech conveyed by the flags.

D.    Nashua's control over the messaging.

The final factor the court must evaluate is "the extent to which the government . . . actively shaped or controlled the expression." Shurtleff, 596 U.S. at 252. Thus, the court must "look at the extent to which [Nashua] actively controlled these flag raisings and shaped the messages the flags sent." Id. at 256. The critical issue for purposes of evaluating this factor is whether or not the City exerted the type of control that "would indicate that [Nashua] meant to convey the flags' messages." Id. The court concludes, based on the evidence presented to date, that this factor weighs in favor of the City.

During the time period when the 2022 Flagpole Policy was in effect, Nashua required anyone wishing to fly a flag on the Citizen Flag Pole to submit an application that included a photograph of the proposed flag "and an explanation of the message intended to be conveyed." Pl. Ex. E at 2. Applications were then "subject to review and approval of the [City's] Risk Manager[,]" who evaluated the flags in accordance with the 2022 Flagpole Policy. Id. Pursuant to that Policy, the City expressly disclaimed the use of the Citizen Flag Pole "as a forum for free expression by the public." Pl. Exs. B and D. Additionally, the City retained sole authority to review the proposed flags, approve or reject flags based on whether the viewpoints they reflected were consistent with the City's own "policies and messages that the [C]ity wishe[d] to express and endorse[,]" and remove any flags that it determined were not in the City's "best interest." Id. During the approximately 29-month period when the 2022 Flagpole Policy was in effect, Nashua denied applications for five different flags to fly on the Citizen Flag Pole. See Beth Decl. at ¶¶ 31-37. Therefore, the control factor weighs toward a finding of government speech. See e.g., Walker, 576 U.S. at 213 (concluding that state "effectively controlled" the messages conveyed by specialty license plates "by exercising final approval authority over their selection." (quotations and citations omitted)).

The Scaers argue that the evidence relating to this factor is insufficient to support a showing of government speech because the City had no role in crafting or editing the flags and never took ownership of the flags.  See Doc. No. 2 at 12-13; Doc. No. 26 at 3-5.  This court disagrees and finds that under the relevant Supreme Court authority, Nashua exercised sufficient control to make such a showing.  For example, in Summum, the Supreme Court considered a city's denial of a religious organization's request to erect a stone monument reflecting the organization's religious views in a 2.5-acre public park located in the city's historic district.  Summum, 555 U.S. at 464-65.  The park contained 15 permanent displays, at least 11 of which − including a historic granary, a wishing well, the city's first fire station, and a Ten Commandments monument − had been donated by private groups or individuals.  Id.  The religious organization, respondent Summum, claimed that the city and various local officials violated the Free Speech Clause of the First Amendment by accepting the Ten Commandments monument but rejecting Summum's proposed stone monument.  Id. at 466.  However, the Supreme Court determined that no such violation occurred because "the placement of a permanent monument in a public park is best viewed as a form of government speech and is therefore not subject to scrutiny under the Free Speech Clause." Id. at 464.

In reaching its conclusion that the monuments in the city's park were government speech, the Court considered the same three factors that apply in this case.  See id. at 470-73.  With respect to the control factor, the Court "rejected the premise that the involvement of private parties in designing the monuments was sufficient to prevent the government from controlling which monuments it placed in its own park." Walker, 576 U.S. at 210 (describing Summum, 555 U.S. at 470-71).  The Supreme Court found it significant that although many of the monuments in the park "were donated in completed form by private entities, the [c]ity decided to accept those

donations and to display them in the Park." Summum, 555 U.S. at 472. The Court further reasoned in relevant part as follows:

> Respondent does not claim that the [c]ity ever opened up the Park for the placement of whatever permanent monuments might be offered by private donors. Rather, the [c]ity has "effectively controlled" the messages sent by the monuments in the Park by exercising "final approval authority" over their selection. The [c]ity has selected those monuments that it wants to display for the purpose of presenting the image of the [c]ity that it wishes to project to all who frequent the Park; it has taken ownership of most of the monuments in the Park, including the Ten Commandments monument that is the focus of respondent's concern; and the [c]ity has now expressly set forth the criteria it will use in making future selections.

Id. at 472-73 (internal citation omitted).

The evidence before this court establishes a similar level of control by the City in this case. Under the 2022 Flag Pole Policy, Nashua established criteria for selecting flags to fly flags on the Citizen Flag Pole. See Pl. Exs. B and D (requiring proposed flags to "support . . . cultural heritage, observe an anniversary, honor a special accomplishment, or support a worthy cause," and allowing only messages that were "in harmony with the city policies and messages that the city wish[ed] to express and endorse."). It also maintained direct control over the messages conveyed by the flags by requiring applicants to submit photographs of the proposed flags and explanations of their intended messages, and by screening applications for conformance with the 2022 Flagpole Policy. See Pl. Ex. E at 2. Additionally, Nashua exercised final approval authority over the flag applications by subjecting them to the "review and approval of the [City's] Risk Manager[,]" and it further controlled the messages conveyed by the flags on the Citizen Flag Pole by reserving "the right to deny permission or remove any flag that it consider[ed] contrary to the City's best interest." See id.; Pl. Exs. B and D. Although the City did not take ownership of the flags, which remained the property of their owners, it "selected those [flags] that it want[ed] to display for the purpose of presenting an image of the City that it wish[ed] to project" to all who visited City Hall. See

Summum, 555 U.S. at 473.  Under Summum, the control factor weighs heavily in favor of Nashua in this case.

The Supreme Court's discussion of the control factor in Shurtleff is also instructive.  In that case, the Court considered the extent to which the city of Boston "actively controlled" flag raisings by private groups at City Hall and "shaped the messages the flags sent."  Shurtleff, 596 U.S. at 256.  The Court determined that Boston lacked any "meaningful involvement" in selecting the flags or in "the crafting of their messages[.]"  Id. at 258.  As a result, it concluded that the flag raisings were private, rather than government, speech.  Id.

In connection with its analysis of the control factor in Shurtleff, the Supreme Court considered evidence showing that "Boston told the public that it sought 'to accommodate all applicants' who wished to hold events at Boston's 'public forums,' including on City Hall Plaza." Id. at 256 (citation omitted).  It also noted that the application to fly a flag sought no information regarding the nature of the flag or its meaning, and that the city employee who reviewed the applications never sought to review the flags, and never even saw the flags, before they were raised on the city's flagpole.  Id. at 256-57.  Additionally, the Court found it significant that Boston's regular practice "was to approve flag raisings, without exception" and that the city "had nothing – no written policies or clear internal guidance – about what flags groups could fly and what those flags would communicate."  Id. at 257.  Importantly, the Supreme Court noted that Boston "could easily have done more to make clear it wished to speak for itself by raising flags[,]" and it referred to the written policy of San Jose, California, as an example of a flagpole policy that would support government speech.[9]  Id. at 257-58.  According to the Court, that policy "provides in writing that its 'flagpoles are not intended to serve as a forum for free expression by the public,' and lists

---

[9] San Jose, California's flag policy, which the Supreme Court discussed in Shurtleff, can be found at the following online address: https://bit.ly/30tX0Fu.

approved flags that may be flown 'as an expression of the City's official sentiments.'"  Id. (additional quotations and citation omitted).

The facts presented here are easily distinguishable from the circumstances described in Shurtleff.  During the time period relevant to the Scaers' claims, Nashua maintained a written flagpole policy with identifiable guidelines of what it wished to communicate through the flags displayed on the Citizen Flag Pole.  Like San Jose's policy, but in contrast to Boston's policy, the 2022 Flagppole Policy stated that the "potential use of a City flag pole is not intended to serve as a forum for free expression by the public."  Pl. Exs. B and D.  Moreover, Nashua maintained the right to exert ultimate control over the Citizen Flag Pole by reserving for itself "the right to deny permission or remove any flag it consider[ed] contrary to the City's best interest."  Id.

Unlike the city in Shurtleff, Nashua also established procedures for the review and approval of proposed flags.  Pursuant to those procedures, anyone seeking to raise a flag on Nashua's Citizen Flag Pole was required to submit an application to the City Risk Manager that included a photograph of the proposed flag and "an explanation of the message intended to be conveyed."  Pl. Ex. E at 2.  The City Risk Manager then evaluated the application "in accordance with the City's flag pole policy" and decided whether or not to approve the application.  Id.  In contrast to Boston's practice in Shurtleff, the record in this case demonstrates that following the adoption of its 2022 Flagpole Policy, Nashua refused to display five different flags.  See Beth Decl. at ¶¶ 31-37. Therefore, Shurtleff also supports the conclusion that the control factor weighs in the City's favor.[10]

Nevertheless, plaintiffs assert that the evidence undermines this conclusion because it shows that Nashua exercised no control over the flag-raising ceremonies, which conveyed the

---

[10] Plaintiffs argue that the flags displayed on the Citizen Flag Pole under the 2022 Flagpole Policy are comparable to vanity license plates, "which courts have repeatedly held constitute private speech."  Doc. No. 2 at 14. This court disagrees.  As described above, the relevant factors, analyzed in accordance with the circumstances presented in this case, weigh in favor of government speech.

33

meaning of the flags to the public.  Doc. No. 2 at 13.  The Scaers note that some applicants used those ceremonies as an opportunity to criticize City policies, and they point to the raising of the Christian flag, during Holy Week 2024, as an example of a ceremony at which speakers criticized the City.  Id.  Plaintiffs argue that such speech cannot reasonably constitute government speech, and therefore, the flags must have conveyed private speech.  See id.

Plaintiffs' argument is insufficient to show that the control factor supports a finding of private speech.  As an initial matter, plaintiffs' constitutional claims in this action are directed at the City's 2022 Flagpole Policy, not the Special Event Procedures that applied to events at City Hall Plaza.  Furthermore, as detailed above, the evidence shows that the City's Risk Manager relied on a written application, including "a photograph of the flag proposed and an explanation of the message intended to be conveyed[,]" to determine whether a proposed flag complied with the City's 2022 Flagpole Policy.  See Pl. Ex. E at 2.  To the extent applicants subsequently used a flag-raising ceremony to criticize the City and its policies, that did not diminish the control that the City exerted over the flag approval process.  Finally, the City was not required to adopt the message that an applicant associated with a flag in order to rely on the flag to express the City's viewpoint.  See Summum, 555 U.S. at 474 (rejecting respondent's suggestion that a monument can convey only one message, and if the government does not embrace the message intended by the monument's donor, it has not engaged in expressive conduct).  The record demonstrates that flags can have more than one meaning.  Compare Pl. Ex. H at 2 (describing the Pine Tree flag as a means to commemorate Nashua's soldiers who fought and died at the Battle of Bunker Hill) with Pl. Ex. O at 1 (describing the Pine Tree flag as a symbol of the January 6, 2020 attack on the United States Capitol Building).  Therefore, the City's approval of a flag did not necessarily constitute an endorsement of the meaning that the applicant saw in that flag.  See Summum, 555 U.S. at 476-77 (by accepting a privately donated monument and placing it on city property, "a government entity

does not necessarily endorse the specific meaning that any particular donor sees in the monument."). In short, the Scaers' arguments regarding the flag-raising ceremonies do not alter this court's conclusion that the control factor weighs in favor of Nashua.

     E.    <u>Summary</u>.

Because the three factors, taken together, support the conclusion that the flags displayed on the Citizen Flag Pole under the 2022 Flagpole Policy constituted government speech, the Scaers failed to establish a strong likelihood that they will ultimately prevail on their claims against defendants and there is no need to address the parties' arguments regarding the merits of plaintiffs' constitutional claims. <u>See</u> <u>Summum, 555 U.S. at 467</u> ("The Free Speech Clause . . . does not regulate government speech."). Nor is it necessary to address the remaining elements of the preliminary injunction analysis. <u>See</u> <u>Akebia Therapeutics, 976 F.3d at 92</u> ("If the movant fails to demonstrate a likelihood of success on the merits, the remaining elements are of little consequence."). Therefore, this court recommends that plaintiffs' motion for a preliminary injunction be denied.

**CONCLUSION**

For all the reasons detailed herein, this court recommends that the District Judge deny Plaintiffs' Motion for Preliminary Injunction (Doc. No. 2). Any objections to this Report and Recommendation must be filed within fourteen (14) days of receipt of this notice. The fourteen day period may be extended upon motion. Failure to file any objection within the specified time waives the right to appeal the district court's Order. <u>See</u> <u>Santos-Santos v. Torres-Centeno, 842 F.3d 163, 168 (1st Cir. 2016)</u>. Only those issues raised in the objection(s) to this Report and Recommendation "are subject to review in the district court" and any issues "not preserved by such objection are precluded on appeal." <u>Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d</u>

554, 564 (1st Cir. 2010) (quoting Keating v. Sec'y of Health & Hum. Servs., 848 F.2d 271, 275

(1st Cir. 1988)).

 

 

Talesha L. Saint-Marc
United States Magistrate Judge

December 16, 2024

cc:     Counsel of record