# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

---

|  |  |  |
|---|---|---|
| BETHANY R. SCAER and STEPHEN SCAER, | : | |
| | : | |
| Plaintiffs, | : | Case No. 1:24-cv-00277-LM-TSM |
| | : | |
| v. | : | |
| | : | |
| CITY OF NASHUA, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

### PLAINTIFFS' OBJECTIONS TO THE REPORT AND RECOMMENDATION

Plaintiffs Bethany and Stephen Scaer respectfully submit this objection to the magistrate judge's report and recommendation, pursuant to Federal Rule of Civil Procedure 72(b)(1)(C), Local Rule 72.1, and 28 U.S.C. § 636(b)(1)(C). Plaintiffs object to the finding that "the undisputed facts indicate that the flags displayed on the Citizen Flag Pole under the 2022 Flagpole Policy were government speech that is not regulated by the First Amendment," Dkt. 32 at 2-3, and to the recommendation that this Court should deny Plaintiffs' request for preliminary injunctive relief on the grounds that Plaintiffs failed to establish a likelihood of success on the merits.

The City of Nashua cannot manipulate government speech doctrine into a ruse for subsidizing viewpoints they like and discriminating against those they disfavor. The City has sought to maintain the Citizen Flagpole as a forum for favored constituents, while using its written policy to create a superficial appearance of compliance with *Shurtleff v. City of Boston*, 596 U.S. 243 (2022).

Although the magistrate judge correctly held that the motion for preliminary injunction is not moot and that the material facts in this case are not subject to dispute, she erred by applying the wrong legal standard to those facts. Her recommendation improperly extends the government speech doctrine to allow governments to adopt speech by merely fixing a seal of approval, contrary to the Supreme Court's repeated warnings. Once the correct legal standard is applied, it is clear that Plaintiffs demonstrated a likelihood of success on the merits of their claim and are entitled to a preliminary injunction.

## FACTS AND BACKGROUND

The material facts of this case "are undisputed," Dkt. 32 at 3, and accurately summarized in the magistrate judge's report, *see id.* at 3-13. These facts are also set forth at length in prior briefing, incorporated here. *See, e.g.*, Dkt. 2 at 8-12; Dkt. 28 at 1.

On November 5, 2025, the magistrate judge heard oral argument on Plaintiffs' motion for preliminary injunction. *See* Dkt. 32 at 2; Dkt. 31. On December 16, the magistrate judge issued a report and recommendation about this motion. Dkt. 32 at 36. The report offered that the preliminary injunction motion was not moot, because Defendants have failed to demonstrate that it was absolutely clear that the 2022 Flag Pole Policy would not be reinstated, as voluntary cessation doctrine requires. *Id.* at 15-19.

2

The magistrate judge, however, concluded that Plaintiffs were unlikely to succeed on the merits and recommended that this Court deny Plaintiffs' motion for preliminary injunction. *Id.* at 35-36. The judge examined the three factors used by courts to assess whether a government is speaking or merely regulating private speech: "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* at 20 (quoting *Shurtleff*, 596 U.S. at 252. According to the recommendation, the two factors (history and control) weighed in favor of the City of Nashua's position and one (public perception) favored neither party. *Id.* at 25, 29, 35. As a result, the magistrate judge believed that the flags displayed on the Citizen Flag Pole under the 2022 Flag Pole Policy were government speech, rather than private speech. *Id.* at 35.

## ARGUMENT

When a party objects to a magistrate judge's recommended disposition of a dispositive motion, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition." Fed. R. Civ. P. 72(b)(3). Motions for injunctive relief are dispositive. *See* Fed. R. Civ. P. 72(b)(1); *Phinney v. Wentworth Douglas Hosp.*, 199 F.3d 1, 5 (1st Cir. 1999). "[I]ssues fairly raised by the objections to the magistrate's report are subject to review in the district court and

those not preserved by such objection are precluded on appeal." *M. v. Falmouth Sch. Dep't*, 847 F.3d 19, 25 (1st Cir. 2017) (citation omitted).

Plaintiffs fully incorporate herein all their briefing on the challenged points without repeating those filings in their entirety.

I.    THE SUPREME COURT HAS WARNED THAT EQUATING APPROVING SPEECH WITH ADOPTING SPEECH IS A THREAT TO THE FIRST AMENDMENT

The Supreme Court's government speech precedents do not allow Nashua to transform this doctrine into a ruse for viewpoint discrimination. Authorizing speech is not adopting it. "If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." *Matal v. Tam*, 582 U.S. 218, 235 (2017). Thus, the Supreme Court has warned of a "legitimate concern" that governments might abuse "government speech doctrine . . . as a subterfuge for favoring certain private speakers over others based on viewpoint." *Pleasant Grove City v. Summum*, 555 U.S. 460, 473 (2009). Because government-speech doctrine "is susceptible to dangerous misuse, courts "must exercise great caution before extending [] government-speech precedents." *Tam*, 582 U.S. at 235; *see also Shurtleff*, 596 U.S. at 263 (Alito, J., concurring) (courts must "prevent the government-speech doctrine from being used as a cover for censorship," by allowing governments to "surreptitiously engage[] in the regulation of private speech") (internal quotation marks omitted)).

4

To prevent misuse of the government speech doctrine, the Supreme Court has stated that the facts of one case, *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U. S. 200 (2015), "likely mark[] the outer bounds of the government-speech doctrine." *Tam*, 582 U. S. at 239. If the factors weighing in favor of government speech are not at least as strong as in *Walker*, a court *must* find the speech private. *See, e.g.*, *Carroll v. Craddock*, 494 F. Supp. 3d 158, 166 (D.R.I. 2020), *Hart v. Thomas*, 422 F. Supp. 3d 1227, 1233 (E.D. Ky. 2019); *Kotler v. Webb*, No. CV 19-2682-GW-SKx, 2019 U.S. Dist. LEXIS 161118, at *17, *24 (C.D. Cal. Aug. 29, 2019).

This case diverges greatly from the "outer bounds" set in *Walker*: a case about vehicle license plates that served as government IDs and were not vanity plates. In *Walker*, the Texas state government "actively exercised" its "sole control over the design, typeface, color, and alphanumeric pattern for all license plates." *Id.* at 213. Moreover, Texas owned the plates and the designs on them, had exclusive choice over these designs, used images and slogans on the plates to promote tourism and local industries, placed the name "Texas" in large letters at the top of every plate, dictated how drivers disposed of unused plates, and treated the plates as "essentially, government IDs." 576 U. S. at 211-13. As one justice has warned, Walker's "expansive understanding of government speech by adoption should be confined to government-issued IDs" and does not apply to other contexts, such as flag poles. *Shurtleff*, 596 U.S. at 271 n.3 (Alito, J. concurring).

5

The flags displayed on the Citizen Flag Pole, and Nashua's shaping of the messages on these flags, looks nothing like the license plates in *Walker*, as the magistrate judge failed to acknowledge, see Dkt. 32 at 29-30. Rather, the flags here are more similar to vanity license plates, which courts have repeatedly held constitute private speech. *See, e.g.*, *Overington v. Fisher*, Civil Action No. 21-1133-GBW, 2024 U.S. Dist. LEXIS 86614, at *9 (D. Del. May 14, 2024) (collecting cases); *Carroll*, 494 F. Supp. 3d at 165-66; *Hart*, 422 F. Supp. 3d at 1233. The Supreme Court explicitly stated its *Walker* holding did not apply to vanity plates. 576 U. S. at 204; *see also Carroll*, 494 F. Supp. 3d at 166.

The magistrate judge never distinguished these cases or explained why the flags are not comparable to vanity license plates. *See* Dkt. 32 at 33 n. 10. In truth, they are highly comparable. Like vanity plates, flag applicants own the flag, design the message, present finished designs to the government for approval or rejection only, provide them to the city for short periods, decide how to dispose of the flag once its time on the pole is over, and sometimes speak messages that are politically controversial or inappropriate for a local government. *See* Dkt. 32 at 5-6, 9, 27-28.

The magistrate judge would extend the *Walker* precedent to the present case, despite its unanalogous facts, in exactly the way that the Supreme Court admonished courts against. This Court should heed the *Walker*'s limits.

II.    ALL THREE *SHURTLEFF* FACTORS SHOW THAT FLAGS ON THE CITIZEN FLAG POLE ARE THE PRIVATE SPEECH OF THE APPLICANTS.

  A.  Nashua has a long history of using the Citizen Flag Pole as a forum for the private speech of citizens

The magistrate judge also misapplied the three government speech factors by overvaluing the City of Nashua's self-serving characterization, in its official documents, that the flags on the Citizen Flag Pole are government speech and undervaluing the real workings of the flag program in practice. As the magistrate judge discussed, the City of Nashua has a long history of treating the Citizen Flag Pole "as a forum for private speech." Dkt. 32 at 25. From 2017 until May 2022, "Nashua officials asserted almost no control over the flags displayed," and did not "use the Citizen Flag Pole to promote its own messages or policies." *Id.* at 22. Instead, like other municipalities—notably Boston, *see Shurtleff*, 596 U.S.—Nashua ran the Citizen Flag Pole for at least five years as a limited public forum for the speech of citizens.

Nashua's adoption of the 2022 Flag Pole Policy in May 2022 did not alter this purpose. "The world is not made brand new every morning . . . reasonable observers have reasonable memories, and our precedents sensibly forbid an observer to turn a blind eye to the context in which [the] policy arose." *McCreary Cnty. v. ACLU*, 545 U.S. 844, 866 (2005) (cleaned up); *cf.* Dkt. 31 at 19:6-20:4 (discussing *McCreary*). As a result, the Supreme Court has held that when—as in this case—a government successively changes the policies governing a forum, earlier policies continue to affect the interpretation of later policies and the meaning of what is displayed.

7

*McCreary*, 545 U.S. at 868, 871. "[A]n implausible claim that governmental purpose has changed should not carry the day in a court of law." *Id.* at 874. Nonetheless, the magistrate judge accepted Nashua's assertion that 2022 policy marked a change in the forum so that the history prior to May 2022 could be ignored. Dkt. 32 at 22.

Far from a radical break with Nashua's older treatment of the flag pole, the 2022 Flag Pole Policy altered little in practice. Nashua merely added magic words about how the "flag pole is not intended to serve as a forum for free expression by the public," Dkt. 2-6, to its public documents. First Amendment analysis "turn[s] on the substance . . . not on the presence or absence of magic words," lest Supreme Court decisions "be rendered essentially meaningless." *Carson v. Makin*, 596 U.S. 767, 785-84 (2022).

Both before and after the formation of 2022 policy, Defendants and the Nashua community called this pole the "Citizen Flag Pole." *See, e.g.*, Dkt. 28-1 at 1; Dkt. 26-2; Dkt. 24, ¶ 10; Dkt. 2-2, ¶¶ 5-6. This name enshrines the original purpose of the flag, as formerly stated on Nashua's website: to "reserve[]" a "pole in front of City Hall . . . for the citizens of Nashua to fly a flag in support of their cultural heritage, observe an anniversary or honor a special accomplishment." Dkt. 2-3 at 1. Much of this language appears unaltered in the 2022 Flag Pole Policy. *See* Dkt. 2-6.

Both before and after the formation of the 2022 policy, moreover, Nashua flew flags that expressed controversial messages that it is difficult to believe the city as a whole endorses, such as the Christian Flag in May 2024. Dkt. 2-2, ¶¶ 12, 29.

Indeed, Nashua's counsel stated that the city permits the display of allegedly somewhat controversial flags, such as the Progress Pride Flag, but not very controversial flags, such as the Israeli or Palestinian flags. Dkt. 31 at 31:11-17, 34:9-35:12; *cf.* Dkt. 2-2, ¶ 49. Including or excluding flags based on their level of controversy is a viewpoint-based distinction—which is illegal—and thus Nashua has a history of making such illegal distinctions, as it has done here.[1]

Both before and after the formation of the 2022 policy, Nashua officials rejected flags whose message they disfavored. *See* Dkt. 2-9; Dkt. 32 at 12. Nashua discriminated based on viewpoint long before May 2022, for magistrate judge concluded that the Citizen Flag Pole was a forum for private speech from 2017 until May 2022. *See id.* at 6-7, 22, 25. Thus, the magistrate judge implicitly found that Nashua has a history of violating people's First Amendment rights, including Beth Scaer's rights. Nashua's history as an unapologetic rights violator, see Dkt. 2-9, weighs strongly in Plaintiffs' favor.

Even today, Nashua's Event Procedures, on its website, state that "[n]o single organization or agency shall monopolize the City flag pole," Dkt. 2-7 at 2. The magistrate judge never discussed this language, although Plaintiffs highlighted it in

---

[1] Government restrictions on speech in both limited public fora and nonpublic fora must be viewpoint neutral. *See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985). Prohibiting speech in an attempt to avoid controversy is itself a form of viewpoint discrimination against potentially offensive messages. *See Tam*, 582 U.S. at 243; *NAACP v. City of Phila.*, 834 F.3d 435, 446-47 (3d Cir. 2016)).

their brief. See Dkt. 2 at 9, 16. If the flags on the pole were exclusively government speech, then by definition a single organization—the Nashua city government—monopolizes the flag pole. As a result, this language in the city's procedures shows that the pole is a forum for non-city organizations and agencies. The policy only has to prohibit monopolizing because flags are the speech of the applicants. Such a provision would not be necessary if flags were the city's own speech. The history of flag pole strongly favors Plaintiffs' position.

B. The public views the Citizen Flag Pole as private speech

As for the second factor, public perception, the magistrate judge concluded that this factor at least did not favor Defendants. Dkt. 32 at 25. In fact, it weighs heavily in support of Plaintiffs.

The Nashua community's widespread use of the name "Citizen Flag Pole," even after the city itself dropped the title, reveals that the public still considers the pole to be exactly that—a flag pole for private citizens to fly flags. *See, e.g.*, Dkt. 28-1 at 1; Dkt. 26-4 at 1; Dkt. 26-2; Dkt. 2-2, ¶¶ 5-6. Indeed, the "blowback from the first event held by Plaintiff shows who the public thought was speaking"—Plaintiffs. *Atheists v. City of Fort Worth*, Civil Action No. 4:23-cv-00736-O, 2023 U.S. Dist. LEXIS 136635, at *17 (N.D. Tex. Aug. 6, 2023). As one alderman stated, "Beth's hate flag" was the problem. Dkt. 2-8; Dkt. 32 at 6-7.

Flags on Nashua's pole are often raised by private citizens, who conducted a flag-raising ceremony involving controversial speeches, without anyone from the city present. *Id.* ¶¶ 10, 19-20, 28-29; Dkt. 2-1, ¶¶ 7, 10-12, 14-16. Videos of some

10

speeches circulate online, on YouTube and other sites, where they can be watched by many people who were not physically present at the ceremony itself. Dkt. 2-2, ¶¶ 28-29. The Supreme Court considers flag-raising ceremonies and the speeches at these ceremonies to be deeply relevant to who is speaking. In *Shurtleff*, Boston's flag pole—just like Nashua's—stood on a city hall plaza, owned by the city, next to poles flying the American and state flags. *See* 596 U.S. at 249, 255. Nonetheless, the Supreme Court held that the flags on the pole were private speech, partly because the flags "were raised in connection with ceremonies at the flagpoles' base." *Shurtleff*, 596 U.S. at 255. "[A] pedestrian . . . might simply look down onto the plaza, see a group of private citizens conducting a ceremony without the city's presence, and associate the new flag with them," not with the city. *Id*; *see also Atheists*, 2023 U.S. Dist. LEXIS 136635, at *17 (N.D. Tex. Aug. 6, 2023) (holding that banners were government speech because "no private ceremonies are implicated in the banner process, and the complete control of setting them up and taking them down falls on the City"). This is also true if an observer watches a privately recorded video of a flag-raising ceremony online, on a private website, where a private citizen uploaded it.

Since 2017, the pole has displayed flags with a range of perspectives, including some that would be strange or inappropriate for a city to express. *See* Dkt. 2-2, ¶¶ 11-12; Dkt. 2-1, ¶¶ 8-9. Even if members of the public associated flags raised in ceremonies where the mayor or other officials spoke with the city, see Dkt. 32 at 27,

that just demonstrates that the viewers recognized that the Citizen Flag Pole was not a forum for exclusively government speech. They interpreted each particular flag as either private or governmental, based on the particular speech of that flag. Flags expressing controversial views continued to be displayed, long after May 2022. *See* Dkt. 2-2, ¶¶ 12, 29, 49. If the flags on the Citizen Flag Pole are government speech, then Nashua "is babbling prodigiously and incoherently" and "expressing contradictory views." *Tam*, 582 U.S. at 236.

The flags displayed "represent[] a wide variety of cultures, events, and causes," reflecting the diverse "backgrounds and views of Nashua's community members." Dkt. 32 at 27-28. A viewer is unlikely to think, for instance, that Nashua has an official position about whether Kurdistan should be independent from Iraq; whether the Free State Project and the growth of the Libertarian Party benefits New Hampshire; or whether Christians must reclaim America for Jesus Christ. *See* Dkt. 2-2, ¶ 11-12, 19-20, 29, 32; Dkt. 2-1, ¶¶ 10-12, 14-16. People living in Nashua have opinions about these issues—not the city itself.

Indeed, it is doubtful that Nashua could "express and endorse," Dkt. 2-6, the religious message of the Christian Flag or the Luther Rose Flag in its own voice, without violating the Constitution.[2] "The Constitution guarantees that government

---

[2] Nashua's policy states that the city only permits flags with messages "that the city wishes to express and endorse." Dkt. 2-6. As a result, Defendants cannot allow the flying of a flag, such as the Christian Flag in May 2024, without endorsing its message. Unlike in *Summum*, this is not a case where the government adopted a

may not coerce anyone to support or participate in religion or its exercise" through "subtle coercive pressure that interferes with an individual's real choice." *Freedom from Religion Found. v. Hanover Sch. Dist.*, 626 F.3d 1, 12 (1st Cir. 2010) (cleaned up). A city cannot use government speech and resources to subtly pressure citizens into supporting Protestant Christianity or Christianity in general. *See Summum*, 555 U.S. at 468 ("government speech must comport with the Establishment Clause."). As a result, an objective viewer would perceive that the Christian and Luther Rose flags, for instance, express the viewpoints of those who applied and who gathered at the ceremony to raise them—not of the city itself.[3]

 C. Nashua does not shape or control the message of the flags displayed on the Citizen Flag Pole, beyond approving or denying them

Finally, the magistrate judge wrongly equated shaping and control with mere approval. Approving private speech without altering it, however, does not adopt that speech as the government's.

---

different message than the one that the original private speaker had. See 555 U.S. at 476-77. Under Nashua's own policy, the city's approval of a flag constitutes an endorsement of the exact "message sought to be permitted" that the applicant intended to convey through the flag, as explicitly written on the flag application. Dkt. 2-6; Dkt 2-7 at 2; *contra* Dkt. 32 at 34-35.

[3] The magistrate judge dismissed Plaintiffs' Establishment Clause argument as "too speculative." Dkt. 32 at 28 n.8. But, under Supreme Court precedent, "the public perception factor . . . clearly involves a degree of speculation." *Feldman v. Denver Pub. Sch.*, Civil Action No. 23-cv-02986-RMR-STV, 2024 U.S. Dist. LEXIS 174889, at *10 (D. Colo. Sep. 26, 2024). As the magistrate judge noted, Nashua has a long history of allowing religious flags that continued after the promulgation of the 2022 policy, *see* Dkt. 32 at 6, and this history shapes public perception of the Citizen Flag Pole, *see McCreary Cnty.*, 545 U.S. at 866. Moreover, it is undisputed that, as recently as May 2024, Nashua flew explicitly religious flags on a pole it is claiming is for government speech. *See* Dkt. 32 at 6, 11.

"[T]he mere fact that government authorizes, approves, or licenses certain conduct does *not* transform the speech engaged therein into government speech." *New Hope Family Servs. v. Poole*, 966 F.3d 145, 171 (2d Cir. 2020) (emphasis original) (collecting cases). Private speech cannot "be passed off as government speech by simply affixing a government seal of approval," even if approval requires meeting the government's stringent criteria. *Tam*, 582 U.S. at 227-28, 235 (describing the criteria for approval used by the Patent and Trademark Office). A city may not consider private speech its own speech because it "simply adopted [the speech] without alteration." *Cajune v. Indep. Sch. Dist.* 194, 105 F.4th 1070, 1081 (8th Cir. 2024). "Without more, the mere existence of a review process with approval authority is insufficient." *Id.*

Instead, "[f]or the adopted expression to qualify as the government's, the private party must alienate control over the medium of expression to the government . . . Otherwise, the government is simply providing a forum." *Shurtleff*, 596 U.S. at 270-71 (Alito, J. concurring); *cf.* Dkt. 21 at 5-6 (Defendants' quoting Alito's concurrence as authoritative). Shaping and controlling a message, that is, means much more than approving a message that fits certain criteria and then declaring this message "adopted." The government must acquire a permanent possessory interest. The private speaker must relinquish possessory rights.

In *Walker*, for instance, Texas adopted a proposed plate design because the state permanently owned the license plates and the designs on them, placed its name on

the plates, "actively exercised" its "sole control over the design, typeface, color, and alphanumeric pattern for all license plates," used plate designs to promote local industries and tourism, and "dictate[d] the manner in which drivers may dispose of unused plates." *Walker*, 576 U.S. at 212-13. *Walker*, moreover, "likely marks the outer bounds of the government-speech doctrine," *Tam*, 582 U.S. at 238, and its "expansive understanding of government speech by adoption should be confined to government-issued IDs," *Shurtleff*, 596 U.S. at 271 n.3 (Alito, J. concurring). In a case that does not concern government IDs, such as this one, far more action would be necessary before a government has adopted private speech.

In *Summum*, for example, the city adopted a donated monument when it "took *ownership* of that monument and put it on *permanent* display in a park that it owns and manages" so that "[a]ll rights previously possessed by the monument's donor have been relinquished." 555 U.S. at 473-74 (emphasis added). The government action in *Summum* is not "similar" to Nashua's here at all. *Contra* Dkt. 32 at 30-31. Likewise, the Eighth Circuit rejected the claim that a school district's final approval authority over posters in the classroom and criteria that teachers only display posters with "instructional value," constituted adopting speech—even when the posters were reviewed by a school advisory committee had edited the iconography of at least one poster. *Cajune*, 105 F.4th at 1081-82. And the Eleventh Circuit found a level of shaping and control sufficient for adoption because the government "entirely scripted" announcements at sporting event and limited advertisements to a small

15

group of pre-selected sponsors who had to submit ads' text for pre-approval and integration into the script that the government itself wrote. *Cambridge Christian Sch., Inc. v. Fla. High Sch. Ath. Ass'n, Inc.*, No. 22-11222, 2024 U.S. App. LEXIS 22302, at *42, *51, *55 (11th Cir. Sep. 3, 2024).

In contrast, Nashua does nothing to shape or control the messages expressed by the flags on the Citizen Flag Pole, beyond approving or rejecting the applications in the first place. Nashua's connection to these flags is transitory—rarely more than a week—not permanent. Dkt. 32 at 5. City officials merely review applications to see if flags are "worthy," in "the City's best interest," and "in harmony with city policies and messages that the city wishes to express and endorse." Dkt. 21 at 7; Dkt. 2-6. This policy supplies no objective criteria for evaluating applications. Instead, just like Boston, Nashua lacks any "clear internal guidance" about "what flag groups could fly and what those flags would communicate." *Shurtleff*, 596 U.S. at 257. The decision is left to Nashua's officials' subjective assessment about "best interest" and which messages might cause the city to get "inundated with angry phones, [and] e-mails." Dkt. 31 at 34:6-15.

Nashua's short 2022 flag pole policy contrasts sharply with the detailed, three-page policy for the City of San Jose, California, which the Supreme Court approved in *Shurtleff*. 596 U.S. at 257-58. In fact, there was no flag application process in San Jose. Instead, the city simply "list[ed] approved flags that may be flown," prohibited all flags not listed, and restricted who could request each pre-approved flag.

16

*Shurtleff*, 596 U.S. at 257-58; *see also* Dkt. 32 at 32 n. 9 (providing a hyperlink to San Jose's policy: https://bit.ly/30tX0Fu). For instance, San Jose allowed the flags of the governments recognized by the United States, but only at the request of the mayor or certain city officials. Other flags, such as the flags of official sister cities to San Jose, could only be displayed in conjunction with official actions, events, or proclamations of the City Council. San Jose did not permit private civic groups such as the Lion's Club or a local ethnic community to fly that group's flag as part of a ceremony the group itself organized and conducted. *See* Dkt. 32 at 5-6.

Other than the use of some magic words, Nashua's 2022 flag pole policy is not at all "[l]ike San Jose's policy." *Contra* Dkt. 32 at 33. Nashua's policy contains no list of pre-approved flags or requesters. Dkt. 2-6. It sets up an application process and allows "[a]ny group" to apply to fly any "flag in support of cultural heritage, [to] observe an anniversary, honor a special accomplishment, or support a worthy cause." *Id.* Flag applications to Nashua must include "a photograph of the flag and an explanation of the message intended to be conveyed," Dkt. 2-7 at 2, and there is no evidence of the city ever editing flag iconography. The message of the flag and its exact iconography must be fixed before Nashua even reviews the application.

Applicants do not alienate ownership or control over their flags. Anyone "wishing to fly a flag must provide the flag," Dkt. 2-6, which remains the applicant's property, and which the applicant may take home once its time on the pole is complete, *see* Dkt. 2-2, ¶ 8; Dkt. 2-1, ¶ 10. Applicants often raise the flag on the pole

themselves, using a special tool, so it is possible that no city official ever touches the flag. *See* Dkt. 2-2, ¶¶ 7, 10, 19; Dkt. 2-1, ¶ 12. Nashua's application process parallels the one used in Boston, which also required applicants to describe in writing the flag to be flown and the flag-raising ceremony planned. *Shurtleff*, 596 U.S. at 256-57. Yet the Supreme Court held that the flags that Boston approved remained the private speech of the applicant. *Id*.

Additionally, Nashua does not shape or control flag-raising ceremonies, although these ceremonies convey a flag's meaning to the public. Nashua merely requires applicants to describe a ceremony's basic details (such as the number of attendees and the extent to which the ceremony may occupy the sidewalk). Dkt. 2-2, ¶ 10. Once a flag is approved, applicants often raise the flag themselves, without anyone from the city present. *Id.*, ¶¶ 10, 19-20, 28-29.

Applicants have used flag-raising ceremonies as an opportunity to attack city policies. When Beth Scaer raised a flag honoring the Nineteenth Amendment, for instance, she delivered a speech discussing how Mayor Donchess' gender-identity policies undermined women's sex-based rights. *Id.*, ¶ 28. Likewise, when the Christian Flag was raised in March 2024, ceremony speakers urged the audience to reclaim America for Jesus Christ and criticized Nashua for allowing flags such as the Pride Flag that support progressive politics while rejecting flags with conservative messages. *Id.*, ¶ 29. These speeches later circulated on the internet. *Id.*, ¶¶ 28-29. Nashua most certainly did not speak these messages, criticizing itself.

Indeed, the city probably could not speak the Christian Flag's message without violating the Establishment Clause.

The City of Nashua has no role whatsoever in crafting the iconography of the flags flown, does not control the message of flag ceremonies, and acquires no permanent possessory interest over these flags. It does not shape or control the symbolic speech on the Citizen Flag Pole and has not adopted the message of the flags on that pole, contrary to the magistrate judge's recommendation.

III.    DEFENDANTS' POLICIES AND PRACTICES ARE VIEWPOINT DISCRIMINATORY, VAGUE, OVERBROAD, AND A PRIOR RESTRAINT ON SPEECH.

Because the magistrate judge concluded that the flags were government speech, she did not consider whether Defendants' policies could survive First Amendment scrutiny or analyze the remaining elements for a preliminary injunction. Dkt. 32 at 35. Plaintiffs, however, have demonstrated that—once this Court holds that the flags are private speech—Nashua cannot justify its policies under the relevant First Amendment standards. *See* Dkt. 26 at 6-11; Dkt. 2 at 20-29. "There is no dispute," for instance, that Nashua denied Plaintiffs' flag applications because the messages of Plaintiffs' flags were not "in harmony with the City of Nashua's policies and messages that the City of Nashua wishes to express and endorse." Dkt. 32 at 12. This is obvious viewpoint discrimination. Thus, this Court has the authority either to declare these policies unconstitutional on its own or to remand back to the magistrate judge for her to address these issues initially.

## CONCLUSION

This Court should reject the magistrate judge's recommended disposition and grant Plaintiffs' motion for preliminary injunction.

Dated: December 23, 2024                     Respectfully submitted,

/s/ Roy S. McCandless                        /s/ Nathan J. Ristuccia
Roy S. McCandless                            Nathan J. Ristuccia***
New Hampshire Bar No. 11850                  Virginia Bar No. 98372
MCCANDLESS LAW FIRM                          Endel Kolde*
125 North State Street                       Washington Bar No. 25155
Concord, New Hampshire 03301                 INSTITUTE FOR FREE SPEECH
Tel: (603) 841-3671, Ext. 101                1150 Connecticut Ave., NW
Fax: (603) 513-2799                          Suite 801
roysmccandless@gmail.com                     Washington, D.C. 20036
                                             Tel: (202) 301-3300
                                             Fax: (202) 301-3399
                                             nristuccia@ifs.org
                                             dkolde@ifs.org

                                             *Pro hac vice

                                             Counsel for Plaintiff

---

** Not a D.C. Bar Member but providing legal services in the District of Columbia exclusively before federal courts, as authorized by D.C. Ct. App. R. 49(c)(3).

21

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2024, a copy of the foregoing document was served on all counsel of record, using the Court's CM/ECF system.

Dated: December 23, 2024

_s/Nathan J. Ristuccia_